UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

**KENNETH A. OLSEN**
**Plaintiff,**

**v.** **C.A. No: 03-245 ML**

**TOWN OF WESTERLY;**
**WESTERLY TOWN COUNCIL;**
**RICHARD COMOLLI, PATRICIA DOUGLAS, ANN SCHWER, DIANA AVEDISIAN, JAIMI SILVESTRI, NANCY RICHMOND, MARY JANE DIMAIO, MELINDA BOEGLIN and ETSUKO ZUCZEK**
**Defendants**

# DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Now come the defendants, the Town of Westerly, Westerly Town Council, Richard Comolli, Patricia Douglas, Ann Schwer, Diana Avedisian, Jaimi Silvestri, Nancy Richmond, Mary Jane DiMaio, Melinda A. Boeglin and Etsuko Zuczek, and, pursuant to Rule 56 of the Federal Rules of Civil Procedure, move this Honorable Court for Summary Judgment in their favor and against the plaintiff, Kenneth A. Olsen. In support thereof, the Defendants state that there are no genuine issues of material fact in dispute and they are entitled to judgment as a matter of law because the Plaintiff was not deprived of a protected property interest and cannot establish a violation of the equal protection clause under a "class of one" theory. The Defendants further rely on the Memorandum of Law, and the Exhibits appended thereto, contemporaneously herewith and incorporated herein as if set forth in full.

WHEREFORE, the defendants, the Town of Westerly, Westerly Town Council, Richard Comolli, Patricia Douglas, Ann Schwer, Diana Avedisian, Jaimi Silvestri, Nancy

Richmond, Mary Jane DiMaio, Melinda A. Boeglin and Etsuko Zuczek, respectfully request that this Honorable Court grant their motion for summary judgment.

Respectfully Submitted
Defendants,

By their Attorneys,

George H. Rinaldi #5599
Little Medeiros Kinder Bulman &
Whitney PC
72 Pine Street
Providence, RI 02903
Tel: (401) 272-8080
Fax: (401) 272-8195

Dated: November 28, 2005

## CERTIFICATION

I hereby certify that on the 28th day of November, 2005 I caused a copy of the within Motion to be mailed, by First Class mail, postage prepaid, to Raymond T. Trebisacci, Esquire, Trebisacci, Reck & Hall, LLC, 398 Liberty Street, Pawcatuck, CT 06379.

O:\Data\612.104\Dktct\Mot\05692.doc

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

**KENNETH A. OLSEN**

**v.** **C.A.No.: 03-245-ML**

**TOWN OF WESTERLY; et al**

**MEMORANDUM OF LAW**
**IN SUPPORT OF DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

## I. FACTS AND TRAVEL

In 2000, the Plaintiff, Kenneth Olsen, marked his twenty-fifth anniversary as an employee of the Westerly Police Department. At the time, the Plaintiff held the rank of Lieutenant and was the Town's prosecuting attorney. Under the terms of special legislation first enacted in 1938 and amended in 1943, all members of the Westerly police force must retire on December 31st of the year in which they achieve this milestone. 1943 P.L. Ch. 1298 § 6. ("Mandatory Retirement Statute"). This statute also gives the Westerly Town Council ("Town Council") the discretion to grant requests by police officers that they be allowed to serve for an additional year. Id. The above captioned matter is the result of the Plaintiff's unhappiness with the decision of the Town Council to deny that request.

The Town Council, which at the time consisted of the defendants Richard Comolli, Patricia Douglas, Ann Schwer, Diana Avedisian, Jamie Silvestri, Nancy Richmond, and Mary Jane DiMaio, considered the Plaintiff's request on September 11, 2000. During an executive session, the Pamela Nolan, the then Town Manager, recommended that the Town Council deny the request. (Exhibit 1 -- Minutes of September 11, 2000 Town Council Meeting "Minutes"). This recommendation was

based on a written reprimand that was issued to the Plaintiff on August 26, 1998 by then Chief of Police Bruno Giulini. (Exhibit 2 – Nolan Affidavit, ¶ 6). The reprimand was issued because the Plaintiff interfered in a police investigation wherein the Plaintiff attempted to avoid having his in-laws charged with criminal assault. (Exhibit 3 -- Letter of Reprimand of August 26, 1998.) The Town Council also heard from Chief J. David Smith, who recommended that the request be granted because the Plaintiff had worked hard for him when he took over as chief of police. (Exhibit 1 -- Minutes). In addition, the Plaintiff addressed the Town Council and explained why he wanted to continue working an additional year. (Id.) After due consideration, the Town Council voted to deny the request by a vote of 6 to 1, with Ms. DiMaio voting to grant the request. (Id.)

The request was denied for two primary reasons. The Town Manager, who is "the chief executive officer of our community[,] felt that [the Plaintiff] should not be supported, ... and according to the charter, she is the woman that runs the personnel." (Exhibit 5 -- Deposition Transcript of Richard Comolli ("Comolli") at 12).[1] This was the first time that a town manager, who is "also the public safety director, ever [said] that there were serious things in a [personnel] file and I do not recommend the extension." (Exhibit 7 -- Deposition Transcript of Patricia Douglas ("Douglas") at 18-19). In addition, denying the request allowed other officers to move up the chain of command and rejuvenate the police department.[2]

---

[1] See also, (Exhibit 6 – Deposition Transcript of Diana Avedesian ("Avedesian") at 11-12 ( "I voted to deny his request ... because [of, *inter alia,]* the town managers recommendation to the council.").

[2] (Exhibit 7 -- Douglas at 8) ("I thought there should be a blood transfusion, that I thought the top was stale and we needed new blood up there."); (Exhibit 6 -- Avedesian at 11-12) ("I voted to deny his request ... because I felt *[inter alia]* that the department at that time needed new blood, a chance for people to move up[.]") ; see also, (Exhibit 5 -- Comolli at 15) (Observing that "a lot of policemen coming up through the ranks don't like these extensions because it stops them from advancing.")

The Plaintiff filed suit alleging that the decision of the Town Council to deny his request for an extension "violated [his] Rights of Equal Protection and Due Process guaranteed by the Constitutions of the United States and State of Rhode Island." (Complaint, at ¶ 8). The Defendants now move for summary judgment on these claims and submit this Memorandum in support of that Motion. [3]

## II. ARGUMENT

### A. The Plaintiff Had No Legitimate Expectation of Continued Employment With The Town After His Mandatory Retirement Date.

The Plaintiff is alleging that Town Council violated his due process rights when it exercised the discretion granted to it by statute and denied his request for an extension. "[T]he Due Process Clause does not protect everything that might be described as a benefit." Town of Castle Rock, Colorado v. Gonzales, 125 S.Ct. 2796, 2803 (U.S. 2005) "It is settled law that the requirements of procedural due process apply only when state action deprives a person of a liberty or property interest protected by the Fourteenth Amendment." Daley v. Town of New Durham, 733 F.2d 4, 7 (1st Cir. 1984).

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules

[3] The Complaint does not allege that the defendants violated 42 U.S.C. § 1983, it merely alleges that the defendants violated his rights under the Due Process and Equal Protection clauses of the federal and state constitutions. Section 1983 "create[s] a federal cause of action for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'" Town of Castle Rock, Colorado v. Gonzales, 125 S.Ct. 2796, 2802-2803 (2005). Since the Fourteen Amendment does not provide a direct cause of action, the failure to allege a violation of § 1983, in and of itself, should result in the dismissal of the federal constitutional claims. Azul-Pacifico, Inc. v. City of Los Angeles, 973 F.2d 704, 705 (9th Cir. 1992). In the interest of judicial economy, this memorandum will assume that all the constitutional violations were properly pled. Although this memorandum will address only the plaintiff's federal claims, the arguments set forth herein apply equally to the state constitutional claims. As the Rhode Island Supreme Court has held, the state constitution offers similar protections to federal constitution with request to equal protection and due process claims. Kleczek v. Rhode Island Interscholastic League, Inc., 612 A.2d 734, 740 (R.I. 1992)

> or understandings that stem from an independent source such as state law--rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709 (1972)

Here, the Plaintiff is alleging that the possibility of continued employment with the Town for one year beyond his mandatory retirement date constitutes a constitutionally protected property interest.

> An employee's interest in continued employment constitutes a property interest protected by the due process clause only if the interest is grounded in a legitimate claim of entitlement arising out of state law. To establish a legitimate claim, an employee must offer proof of more than a mere unilateral expectation of continued employment. As a general rule, courts recognize a claim to entitlement if the employee establishes that a statute, rule or contract grants a right to continued employment, absent a showing of cause." Salisbury v. Stone, 518 A.2d 1355, 1360 (R.I. 1986) *citing* Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701 (1972) (Internal quotations omitted)

The Plaintiff's due process claim must fail because he had no legitimate expectation of continued employment beyond December 31, 2000. The Mandatory Retirement Statute requires all Westerly police officers to retire on December 31st of the year in which their twenty-fifth year of service. 1943 P.L. ch. 1298, § 6. As a result, any property interest which the Plaintiff may have had in his employment as a Westerly police officer ended by the terms of this statute on December 31, 2000. Power v. City of Providence, 582 A.2d 895, 905 (R.I. 1990) ("Under state law, Power's property interest ended by its very terms when Power reached the [mandatory retirement] age of sixty."). The ability of the Plaintiff to continue to work as Westerly police officer after that date is wholly dependent on the discretion of the Town Council. As the United States Supreme Court has recently reiterated, its "cases recognize that a benefit is not a protected entitlement if government officials may grant or deny it in their discretion." Town of

Castle Rock, 125 S.Ct. at 2803. In the employment setting, the First Circuit long ago observed that "[a] constitutionally protected property interest has not been recognized where the employee serves at the will and pleasure of the public employer." Ventetuolo v. Burke, 596 F.2d 476, 481 (1st Cir. 1979).

The Rhode Island Supreme Court considered a situation similar to the matter at bar in Gendron v. Stone, 209 A.2d 212 (R.I. 1965). In that case, a state trooper who was not reappointed to a third three year term, alleged, *inter alia*, that he was entitled to notice in writing of the charges against him and opportunity to be heard. Id. at 214. In rejecting these arguments, the Court observed that "[e]ach of the above contentions is predicated on the theory that [he] was in fact removed from his office of trooper. On the contrary, it is undisputed that he had completed his second term of appointment ... and that he was requesting reappointment for a third term." Id. Like the Plaintiff in this case, the trooper's ability to remain on the job was wholly dependent upon the discretion of the appointing authority. As such the Court summarily rejected the trooper's claim that his due process rights were violated. Id. at 215.

The Rhode Island Supreme Court affirmed this holding in Blanchette v. Stone, 591 A.2d 785 (R.I. 1991). After working as a state trooper for twenty three years, Blanchette was notified that he was being involuntarily retired in accordance with § 42-28-22(A) of the Rhode Island General Laws, which states that state troopers "may be retired by the superintendent with the approval of the governor" after twenty years of service. Blanchette, 591 A.2d at 785-786. As such, state troopers with more than twenty years of service "serve[] at the pleasure of [their] appointing authority[.]" Id., at 787. Like the instant Plaintiff, Blanchette filed suit alleging, *inter alia*, that "his retirement

violated his due-process rights under the Fourteen Amendment." Id. at 787. The Rhode Island Supreme Court held, however, that "Blanchette acquired no property interest in continued employment that would assure him of due-process protections." Id. Similarly, the Plaintiff at bar had no property interest in employment after December 31, 2000 and as such the Town was not obligated to provide him with the rights afforded by the Due Process Clause prior to denying his request for an extension.

While it is clear the Plaintiff expected to allowed to work as Westerly police officer beyond December 31, 2000, expectations and hopes are not property interests worthy of constitutional protection and as such the Defendants are entitled to summary judgment on the Plaintiff's due process claims.

B. The Plaintiff Ability To File A Civil Suit Constitutes Sufficient Post Deprivation Process

"In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest **without due process of law**[.] The constitutional violation actionable under § 1983 is not complete when the deprivation occurs, it is not complete unless and until the State fails to provide due process. Therefore, to determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate. This inquiry would examine ... any remedies for erroneous deprivation provided by statute or tort." Zinermon v. Burch, 494 U.S. 113, 125-126, 110 S.Ct. 975 (1990) (Emphasis in original) Thus, the federal courts "cannot hear a procedural due process claim unless a plaintiff alleges that the state provides no constitutionally adequate remedy."

Faerber v. City of Newport, 51 F.Supp.2d 115, 120 (D.R.I. 1999) *citing* Zinermon, *supra;* see also Torres v. Superintendent of the Police of Puerto Rico, 893 F.2d 404, 410 (1st Cir. 1990) ("If state tort law furnishes an adequate remedy, the plaintiff does not have a Section 1983 cause of action merely because the defendant is a government official.").

The Plaintiff has made no such allegation. Indeed, such an allegation would be futile. "By definition, [the Plaintiff's] procedural due process claim fails because [he] have not exhausted [his] state remedies. **This suit is [his] state remedy."** Faerber, 51 F.Supp.2d at 120 (Emphasis in original). As such, the Defendants are entitled to summary judgment on the Plaintiff's due process claims.

C. The Plaintiff's "Class Of One" Equal Protection Claim Must Fail Because There Is No Evidence That He Was Treated Differently Than Other Similarly Situated Officers For An Irrational Reason.

1. The "Class Of One" doctrine is not appropriate in the context of public sector employment.

The Plaintiff is also alleging that by exercising the discretion given to it by the Mandatory Retirement Statute and denying his request for an extension, the Town Council violated the Equal Protection Clause.[4] (Complaint ¶ 8). The Plaintiff has admitted, however, that this claim is not based on any class based animus. (Exhibit -- Olsen at 69). Instead, the essence of his Equal Protection claim is that "everybody else had gotten [an extension], why not me?" (Exhibit -- Olsen at 68)[5]. Thus, this claim must

[4] The Plaintiff is not alleging that the Mandatory Retirement Statute violates the Equal Protection Clause on its face. Indeed, any such claim would be doomed to failure since the United States Supreme Court rejected an Equal Protection challenge to a nearly identical mandatory retirement policy almost thirty years ago. Massachusetts Board of Retirement v. Murgia, 427 U.S. 307, 96 S.Ct. 2562 (1976).

[5] This claim is not accurate. As the Plaintiff acknowledged during his deposition, Detective Sergeant DePerry's request for a fourth extension was denied at the same time that his request was denied. (Exhibit 4 -- Olsen at 41-42). In addition, the initial request of Chief James Gulluscio for an extension was denied in 1980 or 1981. (Exhibit 5, Comolli at 14-15)

be based on the "class of one" doctrine first embraced by the United States Supreme Court in Village of Willowbrook v. Olech, 528 U.S. 562, 120 S.Ct. 1073 (2000).

"[T]the applicability of the 'class of one' theory to an employment based equal protection claim seems dubious." Campagna v. Commonwealth of Massachusetts Department of Environmental Protection, 206 F.Supp.2d 120, 126 (D.Mass. 2002) *affirmed* 334 F.3d 150 (1st Cir. 2003). In dismissing Campagna's Equal Protection Claim, the Massachusetts District Court warned that

> any public employee convinced that someone similarly situated is being treated more favorably could sue his or her employer under the Fourteenth Amendment for a violation of equal protection. Since practically every employee, public or private, is bound to be convinced at some point that he or she is getting the short end of the stick, it is not hard to imagine the bee hive of constitutional litigation that would be generated by this variant of the 'class of one' doctrine. It is unlikely that the Supreme Court intended such a dramatic result in its *per curiam* opinion in *Olech*." Campangna, 206 F.Supp.2d at 127 *affirmed* 334 F.3d 150.[6]

"Class-of one" equal protection cases in the context of public sector employment "are cases in which the plaintiff ... argues only that he is being treated arbitrarily worse than some one or ones identically situated to him." Lauth v. McCollum, 424 F.3d 631, 633 (7th Cir. 2005). As the Lauth Court explained, "[i]f that is the law and any unexplained or unjustified disparity in treatment by public officials is therefore to be deemed a prima facie denial of equal protection, endless vistas of federal liability are opened. Complete

---

[6] The United States Court of Appeals for the Seventh Circuit recently expressed similar concerns. As that court observed, the class of one case more sensibly conceived, is one in which a public official, with no conceivable basis for his action other than spite or some other improper motive (improper because unrelated to his public duties), comes down hard on a hapless private citizen. Perhaps he is the holder of a license from the state to operate a bar or restaurant or other business, and the official deprives him of a valuable property right that identically situated citizens toward whom the official bears no ill will are permitted the unfettered enjoyment of. (citations omitted) *** "[W]hen as in this case the unequal treatment arises out of the employment relation, the case for federal judicial intervention in the name of equal protection is especially thin. *** [As such,] [t]he principal effect of "class of one" suits by public employees is, as this case illustrates, to undermine discipline in public agencies. Lauth v. McCollum, 424 F.3d 631 (7th Cir. 2005)

equality in enforcement is impossible to achieve; nor can personal motives be purged from all official action, especially in the frequently tense setting of labor relations." Id. The Lauth Court also warned that allowing "class of one" suits to go forward in the public employment context has the practical effect turning at will or probationary employment "into something very close to tenured employment because it is so easy to invent a case of unequal treatment by a supervisor." Id.

This is precisely what the Plaintiff is attempting to do in this case. The decision to allow the Plaintiff to work as a police officer beyond his mandatory retirement date is wholly discretionary. As such, the Plaintiff has no legitimate property interest in the extension. Town of Castle Rock, *supra;* Salisbury, *supra*; Blanchette, *supra*; and Power, *supra.*. Yet, by virtue of his "class of one" suit, he could receive just that. Like all personnel decisions, the decision to deny the Plaintiff's request to work past his mandatory retirement date involved a number of factors that vary not only with the officer in question, but the time of the request. It is this myriad of factors that makes the "class of one" doctrine inappropriate in the context of public sector employment.

2. The Plaintiff is not similarly situated to the officers who received extensions in the past.

"In order to succeed on a "class of one" claim, the level of similarity between the plaintiffs and the person with whom they compare themselves must be extremely high." Neilson v. D'Angelis, 409 F.3d 100, 104 (2nd Cir. 2005); Barrington Cove Limited Partnership v. Rhode Island Housing and Mortgage Finance Corporation, 246 F.3d 1, 8 (1st Cir. 2001)("[I]t [is] essential that [a class-of-one plaintiff] alleged …that it and its coapplicants were similarly situated in all relevant respects"). Mere allegations of similarity will not do. A "class of one" plaintiff is required "to identify

specific evidence concerning similarly situated individuals who received more lenient treatment[.]" Wojcik,300 F.3d at 104

The question of whether the Plaintiff was "similarly situated" to those officers who were granted extensions in the past is answered by asking "whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. Much as in the lawyer's are of distinguishing cases, the 'relevant aspects' are those factual elements which determine whether reasoned analogy supports, or demands, a like result. Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples." Barrington Cove, 246 F.3d at 8. Unlike a traditional classification based Equal Protection Claim, determining whether a "class of one" plaintiff wrongly treated differently than similarly situated individuals requires a "comprehensive and largely subjective canvassing of all possible relevant factors. It is therefore imperative of the class-of-one plaintiff to provide a specific and detailed account of the nature of the preferred treatment of the favored class." Jennings v. City of Stillwater, 383 F.3d 1199, 1214 (10th Cir. 2004). As such, "[p]laintiffs will have an easier time stating a claim where there are few variable in play and the set of potentially similarly situated individuals is well-defined. *** When multiple variables are in play, however, the difference in treatment can be the product of a number of considerations, conscious or otherwise, many of them legitimate." Id. This is precisely why successful "class of one" cases are extremely rare in the employment context.

The Complaint in this matter fails to even allege that the Plaintiff was treated differently than similarly situated officers, let alone provide the level of detail

necessary to support that allegation. The Complaint merely alleges that until the Plaintiff "all continuations in service ever requested had always been granted." (Complaint ¶ 4) The Plaintiff also failed to provide the required specificity during his deposition. Although the Plaintiff was able to identify various officers who were granted extensions, (Exhibit 4, Olsen at 70), he was unable to identify the factors which had gone into those decisions. Rather than providing the required specificity, the Plaintiff merely opined that his Equal Protection rights were violated because "everybody else had gotten [an extension], why not me?" (Exhibit 4, Olsen at 68).

There are a myriad of factors that go into deciding whether an officer's request to work beyond mandatory retirement will granted. As Ms. Douglas stated in her deposition, the question of granting or denying extension requests "depended on the situation in front of [her]." (Exhibit 7 -- Douglas at 18) A major factor is the experience of the officers who will be promoted should the request be denied.

> That's important in situations, and every day the situation changes or every the situation changes and right now in the particular situation we have at the police department, with a very you force and a whole group of officers retiring all at the same time in the upper segment that would, you know, the many years in service, if I were sitting there today I would not recommend denying someone. I would extend that because there are so few officers with experience left that it would be detrimental to the Town if that happened. (Exhibit 7 -- Douglas at 27).

At the time that the Plaintiff's request was considered, there were "experienced officers in the police department right at this particular time and that's why I said to you earlier it fluctuates and it changes and time change. So at this particular year, 2005, would not be feasible to deny someone an extension if he had experience. It would be to our advantage, it would be advantageous to keep him on because the force is very young and

inexperienced, but at this time when we had Mr. DePerry and Mr. Olsen, no, there were plenty of experienced officers on board." (Exhibit 7 -- Douglas at 28)

As with all personnel decisions put before the Town Council, the recommendation of the Town Manager was critical to the Plaintiff's request for an extension. The Plaintiff was the only officer whose request was not recommended for approval by the Town Manager. This is a critical distinction that played a major role, if not penultimate role, in the decision to deny the Plaintiff's request.[7] Moreover, the negative recommendation was based on the fact that the Plaintiff was given a written reprimand for interfering with a police investigation which involved family members. (Exhibit 2 -- Nolan at ¶6). The Plaintiff has placed nothing in the record that establishes that the other officers who were granted an extension were disciplined for attempting to interfere in an investigation involving family members. This factor, in and of itself, establishes that the Plaintiff was not similar situated to those officers whose request were granted. Stachowski v. Town of Cicero, 425 F.3d 1075, 1078-1079 (7th Cir. 2005)[8]. Similarly, the Plaintiff, who was a lieutenant and the Town's prosecuting attorney when he submitted his request for an extension, cannot be similarly situated to officers of other ranks. It is undisputed that the officers whose requests were granted included a chief, a captain, a lieutenant, two detective sergeants, and a sergeant . (Exhibit 8 – Affidavit of

---

[7] (Exhibit 5 -- Comolli at 12) ("The reason I denied his extension is because the chief executive officer of our community felt that he should not be supported[.]"); (Exhibit 6 -- Avedesian at 11-12)( "I voted to deny his request … because [of, *inter alia,]* the town managers recommendation to the council."); (Exhibit 7 -- Douglas at 18-19) (The primary reason I voted against his request "was the town manager, that I have never heard a town manager in all those years ever say, and she was also the public safety director, ever say that there were serious things in a file and I do not recommend the extension.").

[8] In Stachowski, the Seventh Circuit upheld the dismissal of a "class of one" Equal Protection claim because the Plaintiff did "not allege that he was treated differently than other officers who were awarded retirement benefits after suspension and then termination for misconduct." Stachowski, 425 F.3d at 1078-1079

Laura Dwyer, ¶ 3); (Exhibit 4 – Olsen at 70). Clearly, a lieutenant is not similarly situated to a chief, captain, detective sergeant, or sergeant.

Another factor in denying the Plaintiff's request was the desire to allow other officers to move up the chain of command and rejuvenate the police department.[9] The Rhode Island Supreme Court has recognized that providing such promotional opportunities is a desirable aspect of mandatory retirement policies. Power, 582 A.2d at 904 (Noting that mandatory retirement policies serve to "stimulate performance of younger personnel by providing opportunities for advancement.")

The Plaintiff has failed to offer any evidence that he was similar situated in all relevant respects to the officers who were allowed to work beyond mandatory retirement. The Defendants, however, have provided sworn testimony that the Plaintiff's request was first request that the Town Manager recommended against approving; and that there were experienced officers whose promotion would benefit the department at the time the request was made. Given the lack of similarity between the Plaintiff and the other officers, the Defendants are entitled to summary judgment on the Plaintiff's Equal Protection claim.

3. The Town Council's decision to deny the Plaintiff's request was rational.

As an additional safeguard against opening the floodgates to "class of one" suits arising out of routine matters, "[s]ome courts, taking the lead of Justice Breyer [in his concurring opinion in Olech, 528 U.S. at 565-566, 120 S.Ct. at 1075], have attempted to

[9] (Exhibit 7 -- Douglas at 8) ("I thought there should be a blood transfusion, that I thought the top was stale and we needed new blood up there."); (Exhibit 6 -- Avedesian at 11-12) ("I voted to deny his request ... because I felt *[inter alia]* that the department at that time needed new blood, a chance for people to move up[.]") ; see also, (Exhibit 5 -- Comolli at 15) (Observing that "a lot of policemen coming up through the ranks don't like these extensions because it stops them from advancing.").

cabin the reach of class-of-one equal protection cases by demanding that plaintiffs present evidence not merely of arbitrariness but of malice or ill-will against the plaintiff." Jennings, 383 F.3d at 1211 (citations omitted) The First Circuit requires that a "class of one" plaintiff, or any plaintiff attempting to establish an Equal Protection violation under a malicious or bad faith intent to injury theory, "establish more than that the government official's actions were simply arbitrary or erroneous; instead the plaintiff must establish that the defendant's actions constituted **a gross abuse of power**." Tapalian v. Tusino, 377 F.3d 1, 6 (1st Cir. 2004) (Emphasis added, internal quotation and citation omitted); see also Nestor Colon Medina & Sucesores, Inc. v. Custodio, 964 F.2d 32, 45 (1st Cir. 1992) ("[E]ven an arbitrary denial of a permit in violation of state law--even in bad faith--does not rise above the constitutional threshold for equal protection and substantive due process claims.") The First Circuit has also warned that the "malice/bad faith standard [must] be scrupulously met." Yerardi's Moody Street Restaurant & Lounge, Inc., v. Board of Selectmen, 932 F.2d 89, 94 (1st Cir. 1991)(internal quotation and citation omitted). Moreover, the conduct of the governmental actor is reviewed under "an exceptionally deferential" standard. Wojcik, 300 F.3d at 104.

In addition, "class of one" plaintiffs in the First Circuit must also establish that he or she "has been intentionally treated differently from others similarly situated and there is no rational basis for the difference in treatment." Wojcik, 300 F.3d at 104 *quoting* Olech 528 U.S. at 564 (Internal quotations and modifications omitted); see also, Lauth, 424 F.3d at 634 (A "class of one" plaintiff "must, to prevail, 'negate any reasonably conceivable state of facts that could provide a rational basis for the classification.'")

*quoting* Board of Trustees v. Garrett, 531 U.S. 356, 367, 121 S.Ct. 955 (2001).[10] Thus, in addition to negating any reasonable grounds for the decision, a "class of one" plaintiff must "present a motive to explain why the [governmental] officials would treat [him or her] arbitrarily or irrationally." Donovvan v. City of Haverhill, 311 F.3d 74, 77 (1st Cir. 2002). This requires that a plaintiff "identify specific evidence ... of an arbitrary or irrational motive [for the decision.]" Wojcik,300 F.3d at 104

Thus, to prevail on his "class of one" equal protection claim, the Plaintiff must initially establish "that totally illegitimate animus was the sole cause of [the Council's decision to deny his request for permission to work beyond his mandatory retirement date.]" Lauth, 424 F.3d at 634 (internal quotations, citations and modifications omitted); Barrington Cove, 246 F.3d at 11(Affirming dismissal of "class of one" equal protection claim where plaintiff was unable to establish that it "was subjected to selective treatment **because** it was an out-of-state, for-profit organization.")(Emphasis in original); see also Montanye v. Wissahickon School District, ___ F.Supp.2d ___, 2005 WL 2897555, at 4 (E.D.Pa. 2005)(Observing that "no circuit has held that the illegitimate animus of a decision maker voids a decision for which there was a rational basis.") As such, the decision of the Town Council to deny the Plaintiff's request to work an additional year must be upheld if there is "any reasonably conceivable state of facts that could provide a rational basis [for the decision.]" Federal Communications Commission v. Beach Communications, Inc., 508 U.S. 307, 313, 113 S.Ct. 2096, 2101 (1993). Moreover, the Plaintiff bears the burden of "negat[ing] every conceivable basis which might support [the Town Council's decision.]" Id. at 315, 113 S.Ct. at 2102. In addition,

---

[10] In support of this standard, the court relied on Esmail v. Macrane, 53 F.3d 176, 180 (7th Cir. 1995), a case which was cited with approval by the First Circuit in Tapalian v. Tusino, 377 F.3d 1, 6 (1st Cir. 2004)

"a purpose may conceivably or may reasonably have been the purpose and policy of the relevant governmental decision maker," even if the rationale was never expressly articulated. Nordlinger v. Hahn, 505 U.S. 1, 15, 112 S.Ct. 2326 (1992). Even if The Plaintiff were able meet this high burden and establish that there was no rational basis for the decision to deny his request for an extension, he she must then establish a motive for the improper treatment and that the decision constituted a gross abuse of power.

There is nothing in the record which will allow the Plaintiff to meet these high burdens of proof. The Plaintiff offered various hypotheses during his deposition as to why the Town Council denied his request for an extension, including a desire to punish him for supporting a prior chief who was dismissed by the Town Council, allowing the promotion of Sergeant Materese, and allowing the Town Council to deny Detective Sergeant DePerry's fourth request for an extension. These hypotheses were based solely on speculation on the Plaintiff's part (Id. at 36), speculation that was founded on "rumors" running throughout the Town. (Id. at 41, and 43). "[H]ypothesis is not proof[.]" Lauth,424 F.3d at 634. More importantly, the Defendants have offered sworn testimony that none of the Plaintiff's theories were a factor in the denial of his request.

The mere suggestion that the Plaintiff's support of the prior chief was a factor in the decision was "very repulsive" to Douglas. (Exhibit 7 -- Douglas at 31);[11] The Town Council was not even aware that Sergeant Matarese filled the Plaintiff's position so a desire to promote her in particular could not have been factor in the decision to deny the Plaintiff's request. (Exhibit 6 -- Avedesian at 12-13); (Exhibit 7 -- Douglas at

---

[11] As Ms. Douglas testified at her deposition, an officer who ultimately became chief was promoted at the same time his was writing "blistering letters in the newspaper about the council literally tearing us to shreds and then stomping on us and that didn't stop him from acquiring his extensions or moving up the ladder[.]" Exhibit 7 -- Douglas at 31-32. See also, (Exhibit 5 -- Comolli at 20).

34); and (Exhibit 5 -- Comolli at 20-21). Similarly, the Defendants have presented sworn testimony that Detective Sergeant DePerry's status was not a factor in the decision to deny the Plaintiff's request. (Exhibit 7 -- Douglas at 35). Even Ms. DiMaio, who voted in favor of the Plaintiff's request because she is philosophically opposed to mandatory retirement, (Exhibit 9 -- DiMaio at 29), testified that neither the Plaintiff's support for the prior chief, (Id. at 27), a desire to specifically promote Sergeant Materese, (Id.), nor a desire to deny Detective Sergeant DePerry's request, (Id. at 29), were factors in the decision to deny the Plaintiff's request.

Even if one were to assume *arguendo*, that the Plaintiff's theories were, despite all evidence to the contrary correct, the desire to promote Sergeant Materese is a legitimate reason for denying the request. Power, 582 A.2d at 904 (Noting that mandatory retirement policies serve to "stimulate performance of younger personnel by providing opportunities for advancement.") Such a "legitimate government purpose" defeats any improper conduct, assuming it existed. See, Baker v. Coxe, 230 F.3 470, 474 (1st Cir. 2000). Further, Plaintiff's theories simply do no rise to the level of a "gross abuse of power." Contra, Tapalian v. Tusino, 377 F.3d 1, 4 (1st Cir. 2004)(Conditioning subdivision approval on costly and unnecessary street improvements after the plaintiff rejected defendants request that he "set [the defendant] up with 'two women' who worked at a nightclub located in a building owned by [the plaintiff.]"); and Rubinovitz v. Rogato, 60 F.3d 906 (1st Cir. 1995)(Defendant engaged in vendetta against plaintiff who had evicted a friend and enlisted other government officials to cut off utility service to apartment and charge plaintiff with numerous building code violations.)

The undisputed evidence established that the Plaintiff was the first officer whose request for an extension was not recommended by the Town Manager, and that there were experienced officers ready to move up and rejuvenate the Westerly police department at the time his request was denied. Either of these factors, articulated or not, Nordlinger, 505 U.S. at 15, offer a more than sufficient rationale to defeat a "class of one" equal protection claim. Moreover, the Plaintiff has offered no evidence that the decision of the Town Council was a gross abuse power. There have been "no 'class of one' cases in which a public employee has prevailed, (citations omitted), since the extreme case[[12]] that kicked of the "class of one" movement more than two decades ago." Lauth, 424 F.3d at 633-634. This case should not be the first.

D. To The Extent That They Are Named In Their Individual Capacities, The Members Of The Town Council Are Entitled To The Protection Of The Qualified Immunity Doctrine.

In addition to the members of the September 2000 Town Council, the Complaint names Etsuko Zuczek and Melinda Boeglin as defendants. Ms. Zuczek is the Town's current Finance Director, and Ms. Boeglin held the position temporarily in the fall of 200. Both of these defendants are named in their official capacities as required by Rhode Island law. R.I. Gen. Laws § 45-15-5. It is not clear, however, whether Richard Comolli, Patricia Douglas, Ann Schwer, Diana Avedisian, Jamie Silvestri, Nancy Richmond, and Mary Jane DiMaio are named personally or solely in their capacities as members of the Town Council. To the extent that they are named in their personal capacity, the allegations against them should also be dismissed pursuant to the qualified

[12] "That [case] was Ciechon v. Chicago, 686 F.2d 511 (7th Cir. 1982), where a paramedic was made a scapegoat for conduct that had drawn the wrath of the local media, while her identically situated partner received no disciplinary sanction at all." Lauth, 424 F.3d at 634.

immunity doctrine. "Qualified immunity is intended to shield public officials 'from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" Fabiano v. Hopkins, 352 F.3d 447, 452-453 (1st Cir. 2003), *quoting* Anderson v. Creighton,483 U.S. 635, 638, 107 S.Ct. 3034 (1987) The critical question when applying the qualified immunity doctrine is, therefore, "[c]ould an objectively reasonable official, situated similarly to the defendant, have believed that his conduct did not violate the Plaintiff's constitutional rights, in light of clearly established law and the information possessed by the defendant at the time of the alleged wrongful conduct?" Wood v. Clemons, 89 F.3d 922, 927 (1st Cir. 1996)

Under the Mandatory Retirement Statute, the Plaintiff's expectation of continued employment ended on December 31, 2000. Since the Plaintiff's request for an extension was wholly dependant on the discretion of the Council, he was not legally entitled to employment beyond that date. Power, 582 A.2d at 905. Thus, the Plaintiff had no constitutionally protected property interest for which process was due. (See section III-A above and cases cited therein.) That being the case, no reasonable member of a town council would have provided the Plaintiff with more than the opportunity to meet with them to present his case, assuming they even granted him that courtesy. The individual members of the Town Council are, therefore, entitled to qualified immunity on the Plaintiff's due process claim.

Similarly, it is clear that even the federal courts are struggling with the applicability of the "class of one" equal protection doctrine in the context of public sector employment. (See section III-C and cases cited therein.) Surely if the majority of courts hold that routine employment decisions do not come within the scope of the Equal

Protection Clause, individuals who serve on town councils should not be held personally liable for exercising the discretion granted to them by state law. Thus, the individual members of the Town Council are entitled to qualified immunity on the Plaintiff's equal protection claim.

## III. CONCLUSION

Kenneth Olsen may have wanted and expected to work as a police officer beyond his mandatory retirement date. But wishes and expectations are not constitutionally protected property interests. Kenneth Olsen may have believed that he was similarly situated to other officers whose requests were granted in the past and speculated that the Town Council had no rational reason to deny his request. But the need to keep a lieutenant who interfered in a police investigation in order to help his family and promote experienced officers of lower rank provided all the justification the Town Council needed.

WHEREFORE, the Defendants respectfully request that this Honorable Court grant their motion for summary judgment.

Respectfully submitted

Defendants,
By their Attorneys

George H. Rinaldi (#5599)
Little Medeiros Kinder Bulman &
Whitney, PC
72 Pine Street
Providence, RI 02903
Tel: (401) 272-8080
Fax: (401) 272-8195

Dated: November 28, 2005

**CERTIFICATION**

I hereby certify that on the 28th day of November, 2005 I have caused a true and accurate copy of the within Memorandum to be sent by First Class mail, postage prepaid, to Raymond T. Trebisacci, Esq., Trebisacci, Reck & Hall, LLC, 398 Liberty Street, Pawcatuck, CT 06379

O:\data\612.104\dktct\memspt\05696.doc

**EXHIBIT 1**

**MINUTES OF SEPTEMBER 11, 2000 TOWN COUNCIL MEETING**

4CC

REGULAR MEETING WESTERLY TOWN COUNCIL COUNCIL CHAMBERS

MONDAY SEPTEMBER 11, 2000 7:30 P.M.

---

1. 7:45 P.M. CALL TO ORDER

Present: President Comolli, Vice Pres. Schwer
Councilors Avedesian, Silvestri, Douglas, Richmond, DiMaio
T. Mgr. Nolan, T. Sol. Payne
Co. Clk. Giordano, Acting T. Sgt. Sposato

* * * * *

Motion by Mrs. Avedesian, Seconded by Mrs. Schwer, to go into Executive Session under RIGL Section 42-46-5(a)(1) Personnel – Police Extension and Section 42-46-5(a)(6) Prospective Business or Industry – Communication Towers. (Voted Unanimously by poll vote)

9. 11:35 P.M. EXECUTIVE SESSION

The purpose of this Executive Session was to discuss Personnel and Prospective Business or Industry as follows:

1. Personnel – Police Extension

Chief of Police J. David Smith was invited into the Executive Session.

Discussion was held regarding a request for a one-year extension of employment for Lieutenant Kenneth Olsen.

Chief Smith provided background information concerning the transition made in the department subsequent to him becoming Chief of Police. He stated that Lieutenant Olsen has worked hard for him through the transition period. He further stated that the Department has been restructured and is currently revisiting its department policies.

Town Manager Nolan addressed Lieutenant Olsen's job performance and stated that she does not support an extension for him and cannot recommend same.

Lieutenant Kenneth Olsen was invited into the Executive Session and gave reasons for his request for an extension.

Lieutenant Olsen left the Executive Session.

It was the consensus of the majority of the Council that the one-year extension request for Lieutenant Kenneth Olsen be denied. (Councilor DiMaio dissented)

12:32 P.M. Voted Unanimously to adjourn and to seal the minutes of this Executive Session.

12:33 P.M. Reconvened as a Council

Executive Session Report

Council President Comolli announced that the Council discussed the request for a one-year extension for Lieutenant Kenneth Olsen.

Motion made and duly Seconded to deny the one-year employment extension request of Lieutenant Kenneth Olsen. A poll vote was taken as follows: (So Voted 6 to 1 – Councilor DiMaio dissented)

| YES | NO |
|---|---|
| Avedesian | DiMaio |
| Silvestri | |
| Schwer | |
| Douglas | |
| Richmond | |
| Comolli | |

10. ADJOURNMENT

12:35 P.M. Voted Unanimously to adjourn.

ATTEST: [signature]

Donna L. Giordano, CMC/AAE
Council Clerk

**EXHIBIT 2**

**AFFIDAVIT OF PAMELA NOLAN**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

**KENNETH A. OLSEN**

**v.** **C.A.No.: 03-245-ML**

**TOWN OF WESTERLY; et al**

**AFFIDAVIT OF PAMELA NOLAN**

I, Pamela Nolan, on oath depose and state that:

1. I was the Town Manager of the Town of Westerly Rhode Island from November 1999 to June 2003 and have personal knowledge of the facts set forth herein;

2. As Town Manager, I was responsible for reviewing requests by police officers to work beyond their mandatory retirement date and making recommendations to the Town Council on these requests.

3. In 2000, I reviewed the request of Lieutenant Kenneth Olsen for permission to continue to work as a police officer for one year past his mandatory retirement date.

4. In order to make my recommendation to the Town Council, I reviewed Mr. Olsen's personnel file.

5. Lieutenant Olsen's personnel file contained a written reprimand issued on August 26, 1998 by then Chief of Police Bruno Giulini which was issued because the Plaintiff interfered in a police investigation wherein Lieutenant attempted to avoid having his in-laws charged with criminal assault.

6. Given the presence of this written reprimand in Lieutenant Olsen's personnel file, I decided to recommend to the Town Council that his request be denied.

Pamela Nolan
Pamela Nolan

Commonwealth of Massachusetts
County of Barnstable

Subscribed and sworn to before me on the 21ST day of November, 2005.

[signature]
Notary Public
My Commission Expires: 1-25-2010

**EXHIBIT 3**

**LETTER OF REPRIMAND**

THE TOWN OF WESTERLY, R.I. 1669 OFFICIAL SEAL
Police Services

Bruno L. Giulini
Chief of Police

August 26, 1998

COPY

Lieutenant Kenneth Olsen
Westerly Police Services
5 Union Street
Westerly, Rhode Island 02891

Dear Lieutenant Olsen,

This letter confirms our conversation on Tuesday morning, August 25, 1998, and serves as a reprimand for your involvement in Westerly Police Incident 19811243.

During the early morning hours of Saturday, 15 August 1998, you were off duty, at home and sleeping when your wife received a telephone call from her sister Denise Schroth, or niece, Leanne Sieczkiewicz. The caller advised that Ms. Schroth had been assaulted and was at Westerly Police Headquarters. As a result of this call, you drove to Westerly Police Headquarters and involved yourself in an on-going police investigation involving your sister-in-law and niece.

This investigation involved six individuals. Ms. Schroth, Ms. Sieczkiewicz and a third woman, Crystal A. Hardcastle drove to police headquarters to make a complaint against three women who had just assaulted Ms. Schroth and Ms. Sieczkiewicz in the parking lot at 55 Beach Street. The other three women, Roberta Degiacomo, Romina Fusaro and Jaclyn Gougon, also drove to Westerly Police Headquarters to make a complaint about Ms. Schroth and Ms. Sieczkiewicz.

As a result of your involvement, the investigating officer was forced to alter the course of his investigation. Whereas he had been planning to interview and take statements from all six individuals before deciding on a course of action, he was directed to arrest Ms. Degiacomo, Ms. Fusaro and Ms. Gougon and charge them with assault. As a result, statements were not taken from the three women who were arrested.

Additionally, you required the Watch Commander to arraign the three women who were arrested so that "No Contact" orders could be issued to them. Even after you left Headquarters you continued to involve yourself in this case by telephoning the Watch Commander and directing that the three arrested women also be charged with disorderly conduct.

You told me that you came to Headquarters to render assistance to your sister-in-law and niece because "They are family". You related you had prior knowledge that Ms. Fusaro had been harassing Ms. Sieczkiewicz for some time and is suspected of damaging her car. You were also aware that on night before this incident, Ms. Fusaro had attacked your niece in North Stonington, CT and that incident is under investigation by the Connecticut State Police. You told me that you did not think your involvement constituted interference or a conflict of interest because your sister-in-law and niece were the victims and not the aggressors in this case.

I disagree with your assessment. I believe that your relationship, by marriage, to two of the six individuals involved in this investigation represents a conflict of interest. Your admitted prior knowledge of a problem between Ms. Fusaro and Ms. Sieczkiewicz prejudiced your thinking and influenced your actions. The six women involved in this case and the Westerly Police Department

would have been better served had you left the investigation in the hands of the investigating officer and the Watch Commander. You always have the obligation to call any shortcomings you may believe to exist to the attention of the Operations Commander or me.

I further believe that you took advantage of your position as a ranking officer in the Westerly Police Department by interfering with an on-going investigation and usurping the authority of the investigating officer and his Watch Commander. You were off duty at the time and were not responsible for the conduct of the investigation. Furthermore, I submit, if you had been on duty and responsible for the conduct of this investigation, you should have excused yourself and contacted another officer to oversee the handling of this case.

Your actions in this matter open the Westerly Police Department to charges of favoritism. Such charges could cause our constituency to question the integrity and professionalism of this Agency. All Westerly Police officers must avoid even the appearance of a conflict of interest if we are to maintain the public's trust.

Your involvement is this case is contrary to the **Law Enforcement Code of Ethics** that is included in the **Rules and Regulations of the Westerly Police Department**. The **Law Enforcement Code of Ethics** reads in part, "I will never act officiously or permit personal feelings, prejudices, animosities, or friendships to influence my decisions." It is also contrary to Section D. Conflict of Interest **of the Rules and Regulations of the Westerly Police Department** which begins, "Since the position of a police officer is a public trust, it is important to avoid all situations involving conflicts of interest whether in fact or appearance."

A copy of this letter will be placed in your personnel file for a period of five years from this date. This letter will be removed from your personnel file after a five-year period providing there is no further disciplinary record, or upon your retirement from the Department.

Sincerely,

Bruno L. Giulini

COPY

Bruno L. Giulini
Chief of Police

PC: Personnel File
File

BLG/blg

**EXHIBIT 4**

**EXCERPTS FROM DEPOSITION OF KENNETH OLSEN**

my life where I wanted to leave, that I felt I had a lot to offer, that they had paid for my education, my training, that I had an excellent reputation throughout the state with lawyers, attorney generals, judges, and that I enjoyed my job and felt that I had a lot to contribute to the Department. And we had just come through a tumultuous time with a few different police chiefs in a short span of time, and that we finally had a good administrative team, that I wanted to be part of helping the Department continue to grow, and try to get back into a productive mode.

**Q You said position in life, what did you mean by that?**

A My age, my dependents, life in general. I was not ready to change jobs or look for another job. I had a young child in third grade. I had a daughter in college. I was comfortable with my job. I was happy with my job. So, by the position in my life I mean everything in general was just -- I didn't want to go anywhere else.

**Q You were about 47?**

A 47.

**Q Did this conversation with the Council, was that**



**an open session or executive session?**

A Executive session.

MR. RINALDI: Can we go off the record for a second.

(OFF THE RECORD)

MR. RINALDI: In an off-the-record discussion, Mr. Trebisacci and I discussed some issues raised by the fact that we're discussing events that took place in an executive session. We've agreed that this portion of the transcript will be sealed. Obviously Council can have access to it.

**Q Obviously they denied the request.**

A Correct.

**Q How did you find out about that?**

A I can't recall whether it was the Chief or the Town Manager or through rumor that I heard about it the next morning after the meeting. I officially received notification in the mail, but I knew before that.

**Q You didn't stick around for the vote to be announced?**

A No. It was late at night; they dismissed me; I went home, not anticipating any problems; and



was shocked the next morning.

**Q What happened the next morning? How did you find out?**

A I can't recall who it was that told me. It might have been the chief. He came into my office and he said, they denied your request.

**Q And at a later time you got written confirmation of that?**

A Approximately a day later -- actually I think later that day I received a hand-delivered copy, and the following day a certified copy in the mail from the Town Manager's office that the Council had voted not to extend my employment.

**Q Do you know why they denied the request?**

A No.

**Q Did anyone ever give you a reason?**

A No.

**Q Did anyone ever discuss the denial with you?**

A No.

**Q Why do you think the request was denied?**

MR. TREBISACCI: Objection. He doesn't know what the reasons are for the -- for what the Council -- that's why I'm going to take their deposition, I suppose.



MR. RINALDI: Let me try and rephrase.

MR. TREBISACCI: If he knows as a fact, that's one thing. If he knows, speculation, that's totally different, and he shouldn't speculate.

MR. RINALDI: No. I understand.

**Q You've already testified that you don't know the reasons for the denial. Do you have an opinion as to why you were denied?**

A Yes, I do.

**Q What is that opinion?**

A It's speculation.

**Q Would you go ahead and speculate.**

A There are several different reasons.

**Q What are they? What do you think they are?**

A I don't know them as facts, so....

MR. TREBISACCI: That's fine. It's a perfect response. I mean, he's not supposed to speculate, George. And, I mean, I object to asking him to speculate what was in their minds, because he doesn't know. And whether it be through rumor or not, we're here to talk about facts, not about rumor, conjecture or speculation.

**Q Quoting: "The Town Council, by affirmative vote, may permit his continuation." What do you take that to mean?**
A Exactly what it says.
**Q They can say yes, they can say no. And in your case they said no.**
A And I was never given a reason why.
**Q And you object to their saying no?**
A Yes. When for twenty years prior other people were granted them without question, some up to four extensions, a couple of whom didn't have the position or caliper of service that I had served with. And I felt that for all my investment in the Town, and the Town's investment in me, I certainly deserved at least one more year. And to replace me with someone who had been arrested twice, sat out injured for six years on a non-job-related injury and got a law degree, was vulgar.
**Q So, essentially what you're saying, and again, correct me if I'm wrong, is everyone else was granted it, therefore they had to grant mine; is that basically what this comes down to?**
A Basically that's it. Especially when you



have a department that's just coming out of the rubble, and when you think it would be the most important time to keep continuity and to keep a good team together. And I believe it was the first time in history that the Council and Manager went against a police chief's recommendation. They have always in the past relied on the discretion of the police Chief and on his opinion, being that he's the one that works with the person every day and knows the person. The town manager can't comment on my work performance; she's not there. He can, and he did. So, this Council used its discretion to deny me something that I was fully entitled to; maybe not by law, but certainly by conscience.
**Q You certainly expected it.**
A Absolutely. And I had been given no forwarning whatsoever that this could happen. And to tell someone three months before they have to leave they gotta leave, where they're not prepared, and haven't had a chance to seek out other employment, is wrong.
**Q Not fair.**
A Not fair. If they had told me a year before,



hey, Ken, it's your 24th year next August, we're not going to be giving any more extensions, okay, no problem. Now I've got time to go look, I've got time to take care of my family. But when they tell you that in September, and then you have to leave by the end of the calender year --
**Q Why didn't you submit your request at the first of the year?**
A That's not the way anyone else had ever done it. It's always been just sometime prior to your anniversary date, get it in. Like I said, it was a rubber-stamp issue for 20 years.
**Q Is there a policy on this?**
A No. No. They have to have your request in before your anniversary date. It could be the day before.
**Q The individuals who were on the Council in September of 2000, how many requests for extensions had they acted on?**
A At least two, if not four. I believe Steve DePerry was one of them the year before. I believe they were the same Council that extended Wayne Brusso and Ron Neigh. I'd say at least two or three they granted.



**Q What about the Council that came into place in December of 2000? Actually, they were just elected, so none of them had acted on extensions.**
A None of them had acted on any prior to me. Since then the Council has granted one. Since my denial they've granted one extension.
**Q Now, you're also alleging, again, in Paragraph 8 of the Complaint, that the Council's actions violated your equal protection rights. Why do you feel that your equal protection rights were violated?**
A I would have to defer to my attorney on that. That was his verbiage in there. I believe that I should have been protected as any other member of the department in the past who's received an extension. I think it's all --
**Q Again, everybody else had gotten one, why not me?**
MR. TREBISACCI: Thank you, George. That's the answer.
**Q The denial wasn't based on race, as far as you know. Let me rephrase that. You're not claiming the denial was based on your race.**
A I don't know what it was based on.
**Q I'm talking about what you're claiming. Okay. Do**

**you claim that you were denied this extension because of your race?**
A No.
**Q Because of your gender?**
A No.
**Q Because of your age?**
A No.
**Q Because of your sexual orientation?**
A No.
**Q Let me be complete: Because of a disability?**
A No.
**Q Are you claiming it was denied because of any sort of classification system that had been set up?**
A Possibly a classification system that exists in the minds of the Town Council as to who should be employed and who shouldn't. I must not have met their classification because of my standing for what was right, and their tendency to be vindictive.
**Q What facts do you have to back up your allegations that your equal protection rights were violated?**
A Just the fact that I was not given any opportunity for discussion. There was no format where I could argue my case; it was just a simple



denial, with no explanation why. If they had come to me and said, Ken, this is reason A, B, C and D why we're not extending you, then I would have had an opportunity to address each of those, and to offer an argument to whatever end happened. But I was given no discussion, no reason, just a flat out no. And I think that after 25 and a half years that I deserved better than that.
**Q We've been talking for a while, I think almost from the beginning of this depo you've been saying everybody else got it, not me. Could you put names on who everybody else is?**
A I can give you names and years.
**Q Please. And rank, if you recall that, as well.**
A Ron Neigh, sergeant, one year extension. Wayne Brusso, lieutenant, one year extension. Eugene Trombino, lieutenant, captain and chief, for a total of four extensions. Peter Plenanger, captain, one year extension. Larry Qualtney, detective sergeant, one year extension. Steve DePerry, detective sergeant, three one-year extensions.
**Q Are you aware of anyone who's been denied other than yourself?**



A No.
**Q Have you heard if there has been a policy change among the Council that, you know, we've got to start -- I think the word you used earlier was rubber stamp. Is it your understanding that that's no longer the case, that they're looking hard at these things now?**
MR. TREBISACCI: Objection. Timeframe. I mean, 2001, 2004.
MR. RINALDI: You're right.
**Q Let's break it with the September, 2000 Council.**
A I know that the Council has looked at this, because last June --
MR. TREBISACCI: Hold on for a second. Just so we can keep it clear, he's asking you about the Council in September of the year 2000, if you had known about any policy changes being considered by the Council of September of 2000.
A Oh, no. No, not at all.
**Q What about of the Council of December of 2000?**
A I don't know of any policy changes that they were considering either.
**Q Now, in your original answer you were starting to**



**talk about something that happened, what, this past spring?**
A A year ago June.
**Q June of '04?**
A Of '04. Actually, it started before that. Actually, it started with the retirement of David Smith, in October of 2002. He saw what happened to me, and had an opportunity to gain employment, so left the chief's position, went to Narragansett to become the police chief at, I think, 23 and a half, maybe 24 years. They lost a good chief then, because of this impending 25-year and out that had now happened.
A year or so later, in 2004, Steve Baker, who was the chief, left, because he felt that when his 25 was up he would be ushered out the door. They actually -- I stand corrected. They actually gave him -- he was at one, they give him an extension, they extended him another year, and he left during it to take another position.
June, 2004, shortly after Steve Baker retired, we had six people go out the door because of a change in the contract, and also because they were nearing that 25 mark and didn't want to be

**EXHIBIT 5**

**EXCERPTS FROM DEPOSITION OF RICHARD COMOLLI**

council on September 21, 2000.
A. Right.
Q. How was it that one becomes president?
A. Well, they are usually, right now I guess it's because the largest vote getter gets it most of the time. Of course this time Mary Jane DiMaio and Sammy got it. In my case I wasn't the biggest vote getter but I think with my years of experience on the council, 22 years, they felt that I could handle it.
Q. Sure. You were there when my father was on, right?
A. Oh, yes, always kept him on too.
Q. There you go. All right, as president could you describe what your functions were?
A. Well, more or less the function of the president is to make sure that the agenda moves along and the council meetings are run in orderly conduct and that everybody that approaches is treated fairly. Even in executive session you go in there and you make sure that everybody has a right to have their say and you get a consensus. You can't vote in executive session, and when you come out of executive session you more or less comment on what was brought up. You don't go into detail but then if there is a vote taken you do it in executive session.



Q. I would like to go to the minutes which is the first bunch of documents. The first ones are the ones you had there that's marked number 1. If you could go to the third page of that. Under Number 9, Executive Session, it speaks, it's about the fourth paragraph down where it says, Town Manager Nolan addressed Lieutenant Olsen's job performance and stated that she does not support an extension for him and cannot recommend the same (as read). Are you following with me?
A. Yes.
Q. Okay. What did Town Manager Nolan state about Lieutenant Olsen's job performance?
A. I can't truthfully tell you that I can remember four or five years ago. I do know that -- just what it says there, she did not -- and to be -- I just can't -- I don't want to make anything up, I just can't remember what she said.
Q. And that's fine. Do you recall any specifics of what town -- of what Nolan said about the performance of Ken Olsen?
A. I don't know.
MR. TREBISACCI: If you don't remember that's fine.
A. I don't remember, no.



Q. Now, my next question is, I guess, and I will only ask just a few more questions along those lines but would there be any place where you would have written down those, taken notes, for example, of what Nolan said?
A. I might have made notes at the time but ...
Q. Are those something that would have been kept this far along?
A. I had an attic full that I just finished cleaning out. I don't know if you know what the agendas looked like and everything. If I tell you that it's from here to here (indicating), you just can't -- you just can't keep up. Every councillor should have a secretary I think.
Q. Okay, okay. When you say I cleaned it out, did you throw a lot of the stuff away?
A. It's all, most of it's been thrown away. In fact I just threw out some of it last week or so and I don't know if it had anything to do with this but I have had boxes and boxes all over the place.
Q. Okay. When Nolan made her presentation in executive session back on September 11, 2000, do you have any recollection of whether she presented any type of memorandum along with her or anything written along with her oral presentation to support what she



had to say?
A. I can't truthfully tell you if she did or not. It's just too far back.
MR. TREBISACCI: Okay.
A. Maybe somebody else can but I don't.
Q. That's fine. Do you have any recollection about what Chief Smith had to say about Ken Olsen's performance?
A. No, I don't -- the only reason I know he spoke in favor of him is because of this, but to remember that far back, I just don't. There were just too many things.
Q. Okay. Nevertheless you went along with what Nolan's recommendation was?
A. Yes, yes.
Q. Over what Chief Smith had to say?
A. Yes.
Q. Okay. Do you recall what your reasons were for voting the way that you did to deny his extension?
A. The reason I denied his extension is because the chief executive officer of our community felt that he should not be supported, and like I just mentioned before, I am a legislator and according to the charter, she is the woman that runs the personnel.
Q. And I think that's the correct attitude to have

when you are up there sitting there as president of the council. Okay, let me ask you, at the bottom of that third page of Exhibit 1 it's stated that it was a consensus of the majority of the council that the extension be denied (as read). You already stated something about taking a consensus. Could you explain a little bit more so I know what happens when you are in executive session and you ask for a consensus?

A. Well, it's more or less you ask everybody if they would want to extend their time. You don't go like this (indicating), and I believe the only one that probably said she would want to extend his time is Mary Jane DiMaio, so that's why I said consensus but you don't have a vote.

MR. TREBISACCI: That was my next question.

A. No, you do not vote. It's more or less the majority of people feel you want to extend your time and if you don't, Mary Jane was the only one that spoke up. That's why I made that statement but we did not vote.

Q. However, when you went back out into open session that's when you took a vote?

A. That's when you have to vote.

Q. All right. Do you have any recollection of



what concerns were voiced by some of the other members in relation to this request for an extension?

A. It's just too far for me to remember all, everything, and I would have to be truthful if something hit me and I remembered but I don't.

Q. All right. Do you have any recollection, for example, of what Ann Schwer had to say with regard to Ken Olsen's request?

A. No.

Q. Okay, it's going to go a lot faster than I thought. See that? During your time on the -- well, can you tell me when you have been in service on the Town Council in Westerly?

A. I started in '66 and went eight years, then I was off for four years. I went back for six or seven more years, I don't know, and then I got off and I went back again. I needed a rest in between.

Q. I understand. During that time that you were, those times that you were on the council, do you have any recollection of any other officer coming before the Town Council and having their request for an extension denied?

A. Yes, I think Chief Gulluscio in 1980 -- he was the chief -- he was denied.

Q. And what year was that do you think?



A. '80 or '81, something like that. It might be. I might be off four, five years.

Q. Was he the chief at the time?

A. Yes, he was the chief.

Q. Do you recall the circumstances surrounding the denial of that extension?

A. No, I don't. In fact, I think I voted to keep him but the majority voted not to, and at that time I can't tell you. The only thing I can remember is maybe he was Chief of Police and the manager might have recommended at that time that he stay but I can't tell you.

I think what happens in a lot of these cases, and nobody has approached me myself but I have heard and I have talked to police officers after they retired that a lot of the policemen coming up through the ranks don't like these extensions because it stops them from advancing. I was always fortunate when I first went on the council people used to come to me but I discouraged it, so later in my career nobody came to me for those things because they knew that I wouldn't pay any attention to them. I would try to use my own mind because you get too many sides of these things and you try very hard to do what you think is right, and of course you make mistakes at



times but at the time you make the thing you think you are doing the right thing, but I don't know why -- and that's the only thing I can think is the council at that time were probably getting pressure from the unions because if you look, I don't think the union has ever come forth with a letter for anyone supporting extensions. I don't know if you looked at that but I don't think you will ever find it because they believed strongly that they want the opportunity to move up.

Q. Sure. Now, when Chief Gulluscio came before the council, do you know if he had applied for any extensions prior to that extension that he was denied?

A. I don't think so. I think that was the first one. I think he had 25. He was chief for eight years and I thought he was a good chief.

MR. TREBISACCI: Sure.

A. But the majority didn't want him so that's what they had to do.

Q. Now, other than that situation with Chief Gulluscio, can you think of any other time that a request for extension was denied?

A. I think Gulluscio, DePerry, he was a detective at the time and he asked for an extension and it was granted and I think I voted for that one, and I think

it was because of his work in the detective division. I don't know if it was brought to our attention that there was some cases that weren't completed and they would like to be completed, and then after one or -- I don't know if he had one extension or two but I think it was one, then the next time it was denied.

Q. Okay, all right, but other than DePerry and Galluscio, can you think of any others that were denied?

A. Most of them when they get their 25 years, I know Chief Cimalore, when he got 25 years he left. Trombino, I think at 25 years I think he left. Most of them left. I can't think of any right now. There might be others.

Q. That's fine. Have you, has the council, while you were on the council during any of your periods of time, has the council ever set a policy that there would be no more granting of any extensions whatsoever?

A. I don't think we -- no, we never have and I don't think legally you can do it. I think everybody should have a request, a right to request an extension so I am quite sure we wouldn't have set a policy like that.

Q. All right, fine. You mentioned in one of your



responses about the request for extensions filed by Stephen DePerry, that someone had mentioned that there were some cases that were open and could you -- I guess what you meant by that, there was some cases that were open that he was still working on so we should give him an extension so he could continue to work on those cases?

A. Now, you know, this is what we heard at the time, that there was cases.

MR. TREBISACCI: Yes.

A. To tell you what the cases were or how important they were, we know nothing. I don't know anything. Maybe somebody else knows. If somebody was stretching it a little bit, there could have been, I don't know.

Q. Okay, and I guess my question, that question was going to lead me into another question about Ken Olsen, and the question that I have about Ken Olsen, was there anybody who made any presentation or comments about Ken Olsen saying that either A., he had cases that he still, you know, that are still open that he would like to work on, or B., there was some cases that he handled poorly?

A. No, I didn't hear any of that, no. It might have been said but, you know, I don't recollect. As



far as I know nothing was said like that. The only thing I know is the manager didn't feel that, you know, the position he was in, that it was that important, that he should have to continue I guess.

Q. All right. In the presentation that was made by the manager, did the manager give any policy reasons at all, if you can recall?

A. I can't recall. It wouldn't be fair for me to say something that ...

Q. All right. Let me just ask you some specific questions along those lines to see if it helps with your recollection at all, and if it doesn't, that's okay too. Do you know of any fiscal reasons that were expressed to deny Ken Olsen's request?

A. Not that I know of.

Q. Okay. Do you know, what about the policy of retaining experienced officers so that they can add stability to the department; was that idea ever discussed when dealing with Ken Olsen's request for an extension?

A. I can't truthfully say.

Q. Okay. Do you recall what Ken Olsen's position was or what Ken Olsen's input was on the matter of Chief Giullini when he was going through, when Chief Giullini was going through that period where he



was ending his service with the Town?

A. I don't know if he had any position.

Q. Okay. Was that an issue that was discussed when deciding not to extend Ken Olsen's service with the Town?

A. Not in my recollection. I don't remember that.

Q. Was the advancement of any other officers on the force discussed in relation to Ken Olsen's request for an extension?

A. I can't answer because I don't remember anything. If it was I would probably remember but I don't remember any of that.

Q. You don't remember any of that happening at all or you just have no recollection?

A. I don't remember anything coming about Olsen and Giullini or his name coming up. I don't even know why it would come up to tell you the truth. When you are asking these questions I am saying why would something like that come up. It's usually not the place to come up.

Q. That's fine. That's fine. Any recollection of, besides Olsen and Giullini, any recollection of whether there was any discussion of the relationship between Ken Olsen's request for an extension and the advancement of Lauren Matarese?

Case 1:03-cv-00245-ML Document 37-6 Filed 11/28/2005 Page 5 of 5



A. I don't even know why Lauren Matarese's name is coming up in this because we as a council, she was out two and a half years. We had -- in fact, I was the council president. I had to tell her that we were retiring her. We retired her for six months because -- well, one month because her doctor kept sending us a letter she couldn't work. After we retired her, a month later she got a letter she could work, so I mean, I don't think Lauren Matarese, you know, as far as I am concerned, anything that they would do with her, just forget about that because --
Q. But in relation to Ken Olsen --
A. No, nothing, nothing.
Q. All right, that's fine. As the person who would be building the consensus amongst the council as the president, did you have to do anything or say anything to build a consensus that Ken Olsen's request should not be granted?
A. No, it was just a feeling of the council. I didn't feel it was my position to -- you know, in a case like this I think everybody should -- I shouldn't be there pushing for this fellow, extending it or being there in opposition. I think what the manager says, the Chief of Police and what the councillors' feelings want to do, I think that should be



sufficient. I don't think I should be in a position of pushing anyone or denying anyone.
Q. Why did you feel in this particular situation that you put more stock in what the manager had to say as opposed to what the Chief of Police had to say?
A. Well, the way I look at the two, now the Chief of Police working with this individual all the time probably had a relationship, you know, a clubly relationship, you know, more of a relationship where it's a friendly relationship because he worked with him every day. Where I felt the manager being the head of the Town was more concerned about the personnel, and actually when people speak, too, you can know if they are really sincerely saying what they want or they just do it to say that he supports certain people.
Q. Are you saying that you believe that Chief Smith was not sincere in his recommendation?
A. Well, he wasn't that strong in my estimation.
Q. Do you recall what his recommendation was as for Steve DePerry?
A. If it was strong I would have remembered it.
Q. I understand. Do you recall what his recommendation was as for Steve DePerry?
A. It's right here. It's right here.



MR. TREBISACCI: No, not as for Steve DePerry's request.
THE WITNESS: What's Steve DePerry's request?
Q. Do you recall --
A. No, I don't recall that.
Q. Okay, you don't recall what Chief Smith's recommendation was as regarding Steve DePerry's request?
A. No, I don't.
Q. Would it change your mind at all to know that his recommendation for Steve DePerry was to deny the fourth extension?
THE WITNESS: Fourth extension?
MR. TREBISACCI: Yes.
A. I wasn't there on the fourth extension.
MR. TREBISACCI: Okay, all right, I don't have any other questions. Thanks a lot.
MR. RINALDI: I have no questions.
(DEPOSITION CONCLUDED AT 11:30 A.M.)



DOCKET NO. 03-245 ML : U.S. DISTRICT COURT
KENNETH A. OLSEN : DISTRICT OF RI
VS. :
TOWN OF WESTERLY, ET AL. : OCTOBER 20, 2005

DEPOSITION OF RICHARD D. COMOLLI

I have read the foregoing, and it is a true and accurate transcript of my testimony taken on October 20, 2005 at the Westerly Town Hall, 45 Broad Street, Westerly, RI 02891.

______________________________
Richard D. Comolli

Subscribed and sworn to before me this ________ day of ________________, 2005.

______________________________
Notary Public
My Commission Expires:

(JG)

**EXHIBIT 6**

**EXCERPTS FROM DEPOSITION OF DIANA AVEDISIAN**

MR. TREBISACCI: On the Olsen issue.
A. Not that I recall, no.
Q. Were any memoranda at all or anything written, was anything of a written nature presented to the council on September 11 with respect to Ken Olsen's request for an extension?
A. No.
Q. Okay. Specifically I want to turn to Exhibit 1, and it's again the third page, and it says that Chief Smith -- this is about halfway down.
A. Right.
Q. Chief Smith provided background information concerning the transition made in the department, et cetera (as read). Did Chief Smith provide any written memoranda to supplement his presentation of what he said that night to the council?
A. I don't believe he did. I believe at that time it was just he presenting.
Q. Okay. Likewise --
A. Information, you know.
Q. Okay. Likewise the question I guess, the next question is, in the next paragraph about Town Manager Nolan addressed Lieutenant Olsen's job performance, and do you recall if there was any written memoranda or anything in writing that was prepared by Town



Manager Nolan for presentation along with her discussion that she presented that evening?
A. No, there wasn't.
Q. Okay. How is it that you know Ken Olsen?
A. Just by, you know, living in Westerly and went to school with his sister. I didn't really realize that until after, and you know, being on the force, you know.
Q. Did you know him separate and apart from those business dealings?
A. No, not really. I mean I really never -- he is older than me and I never really -- he never was a friend or someone that I would socialize with. It was just knowing of him being on the force and living in Westerly.
Q. Have you ever discussed his request for extension with him yourself?
A. No, no.
Q. Did you ever tell him why his extension wasn't granted?
A. No.
Q. What is your understanding of -- well, why did you vote to deny his request?
A. Two things. The reason I voted to deny his request was because I felt that the department at that



time needed new blood, a chance for people to move up, and also more so than my feeling of viewing of the department, you know, on the outside, I am not -- I am just -- the scope is the town manager's recommendation to the council.
Q. Okay, when you say that you needed a chance for people to move up, what do you mean by that?
A. Rebirth, refresh. I mean people to start moving up.
Q. Anybody in particular?
A. No, no, just, you know, if you start -- it just appeared a time that, you know, we need those people that are, you know, kind of standing still kind of to come up to the plate. I mean we need to move people up, and when you move one, they all kind of bump up. No particular person, position, none at all, just needed a new birth I will call it.
Q. After Ken Olsen separated his, was separated from his service with the Town, wasn't it Lauren Matarese that was elevated to the position that he once held?
A. Gee, it could be, I don't know. We never get a piece of paper saying who is next or after their testing how they categorize and who is next. We are not privy to any of that. The town manager is, I mean



the ranking. So whether she was up next or not, I am not aware of, nor did that reflect whoever was next in my decision.
Q. And your decision was --
A. We don't see that.
Q. -- whether to --
A. No.
Q. -- to grant --
A. No.
Q. -- or deny --
A. Oh, no.
Q. -- his extension, his request for extension?
A. No.
Q. Okay, that's fine. You also mentioned about the recommendation of the town manager. What was her recommendation in this regard?
A. Just what she says on Page 3, that Exhibit 1, that she did not really feel the same. What she meant was she didn't feel the same as Chief Smith because he is saying to extend, give him the extension and she is saying at this time I can't support that. She doesn't feel the same.
Q. And can you give me specifics of why she felt that she did not support his request for an extension?
A. At that time when she said that she gave no

**EXHIBIT 7**

**EXCERPTS FROM DEPOSITION OF PATRICIA DOUGLAS**

September 11, 2000. Let's see, and I guess that is the only one in which you were involved and that's marked as Exhibit 1. It's my understanding that you -- that the council changed after that September 11, 2000 meeting.

A. Right, it changed two months later.

Q. And were you reelected or were you part of the new council?

A. No, I did not run.

Q. You did not run?

A. No.

Q. Okay, so I guess the only thing, the only documents in front of you that you will be concerned with today is Exhibit 1, which is the September 11, 2000 meeting. Did you review anything at all in addition to being provided with these minutes?

A. No.

Q. All right. You kept no notes of the proceedings or did you keep any notes of the proceedings?

THE WITNESS: Of this proceeding?

MR. TREBISACCI: Yes.

A. Why would I? No.

Q. Okay, and believe me, I am not trying to argue with you, I am just trying to get --



A. I know but it's five years ago. I won't keep -- unless it was major issues in the town that I had kept.

Q. Okay, so on certain major issues you kept your own notes on proceedings that came before the council?

A. No.

MR. RINALDI: Could I object? You are saying kept and I just want to make sure we are on the same page. When you say kept, do you mean took notes during the meeting?

MR. TREBISACCI: Yes.

MR. RINALDI: Or do you mean kept as in still have now?

MR. TREBISACCI: Kept as in still have now.

THE WITNESS: You mean personal notes?

MR. TREBISACCI: Yes.

A. No, I am talking newspaper articles and things like that on major issues in the town.

Q. Okay, and I guess what I am talking about is any particular notes or memoranda that you may have kept that were generated as a result of Ken Olsen's request for an extension back in September of 2000.

A. No.

Q. How do you know Ken Olsen?



A. Through the police department.

Q. All right, do you know him separate and apart from his work on the police department?

A. No.

Q. Certainly you have never socialized with him in any way.

A. No.

Q. Have you ever discussed his request for an extension with him personally?

A. No.

Q. All right, did you ever tell him at all why his extension wasn't granted?

THE WITNESS: Did I tell him personally?

MR. TREBISACCI: Yes.

A. No.

Q. All right. What is your understanding of why the council denied his request?

MR. RINALDI: Let me object again. You are --

THE WITNESS: I don't understand why --

MR. RINALDI: One second. Let me object because you are asking her to speak for other members of the council. She can certainly speak as to why she voted no.

MR. TREBISACCI: And I will ask her that.



THE WITNESS: That's what I was going to say.

Q. Why did you vote to deny the extension?

A. My opinion and only my opinion as to why I voted the way I did was because I felt this department needed to move on and I believed the -- well, let's put it this way. I thought there should be a blood transfusion, that I thought the top was stale and we needed new blood up there.

Q. All right, and when you say the need to move on, what --

A. To move up, to change the positions.

Q. Okay, and when you say to change the positions do you mean -- I guess was it your opinion that the police department, that the Town should have just cleaned house with the upper positions of the police department?

A. No.

Q. Okay, then I guess I need to have a better understanding of what you mean by what you just said, okay. Could you explain it to me so I have a better understanding?

A. It was my feeling that the department was getting stale and I thought the police, the officers at the top, as they came up to their 25 years at that

feeling as to why -- as to the granting of extensions?
A. It was my personal feeling that the department would be healthier if people moved up the ladder.
Q. How did you feel when prior requests for an extension came before the council and were granted?
THE WITNESS: How did I feel?
MR. TREBISACCI: Yes.
MR. RINALDI: Again, let me put an objection on relevance grounds on the record but you can answer the question.
(Pause)
MR. RINALDI: Do you remember the question?
THE WITNESS: No.
Q. Did you ever vote, prior to Ken Olsen coming and asking for a request for an extension did you ever vote against an extension that came before the council?
THE WITNESS: On anyone?
MR. TREBISACCI: Yes.
A. I may have.
Q. Okay. Is there something between the last person prior to Ken Olsen that came and requested an extension on the police department and this time when Ken Olsen came before the police department requesting



an extension, did your feeling, did your opinion about extensions change?
A. I don't know when the last person was or who the last person was or when it was so --
Q. Did you have a change --
A. You will have to refresh my memory.
Q. Well, in 1986 when you were first elected to the council what was your feeling on requests for extensions by members of the police department?
A. It depended on the situation in front of me.
Q. Okay. In 1987 what was your feeling about requests for extensions by the police department?
A. It depended on the situation in front of me.
Q. And I take it that's going to be your answer --
A. Yes, and it would be my answer today if I was sitting on the council.
Q. Okay, that's fine. Let me ask then why you felt that Ken Olsen should not be granted an extension.
A. Because the situation was the way it was and at that particular time I felt the officers who were requesting an extension in time should not be granted because I felt the department should move.
Q. And I need you to give me specifics.
A. One of them was the town manager, that I have



never heard a town manager in all those years ever say, and she was also public safety director, ever say that there are serious things in a file and I do not recommend the extension.
Q. And what serious things did the town manager refer to when she did not recommend the extension?
A. She did not say.
Q. And you took it on faith --
A. No.
Q. -- that because she said it --
A. She is the town manager and the public safety director and all we knew was that there were the complaints in the files and whatever they are called, reprimands or whatever were by the chief.
Q. Okay, and do you recall any specifics of what those reprimands were?
A. She did not say.
Q. Okay. Did you ask her what those specifics were?
A. Yes, I believe we did ask her and she was not comfortable with revealing things in the personnel file.
Q. So she didn't give any specifics?
A. The rumors were on the street.
Q. I'm sorry?



A. The rumors were on the street.
Q. Did Town Manager Nolan give any specifics --
A. No.
Q. -- as to what she was talking about?
A. No.
Q. She did not?
A. No.
Q. Did you ask her --
A. Yes, we asked.
Q. And did she respond to those questions?
A. By saying that she did not believe she could reveal things in a personnel file.
Q. What were the rumors that were on the street, ma'am?
A. I don't know, there is always rumors on streets.
Q. Well, it's something that struck a chord with you? What were the rumors specifically?
A. One of them was that he interfered with an investigation that involved family members.
Q. And when did that take place, ma'am?
A. I have no idea.
Q. Okay, and did you ever give Ken Olsen the opportunity to respond to that accusation?
A. He wanted me to call him up and say to him did

Q. Did Chief Smith make a recommendation as to whether Ken Olsen's request for extension be granted or not?
THE WITNESS: Say that again please?
Q. Did Chief Smith make a recommendation as to whether Ken Olsen's request for an extension should be granted?
A. His recommendation was that the request should be granted.
Q. His recommendation was that the request should be granted?
A. Right.
Q. Okay, and do you recall why he made that recommendation?
A. Basically that's in that paragraph.
Q. Okay, that's fine. However, you chose to go along with what Town Manager Nolan said about Ken Olsen's performance.
A. Absolutely.
Q. Okay, and can you think of anything, anything other than your standard answer of basically that's what's included in that paragraph, can you think of any specifics of what Town Manager Nolan said about Ken Olsen's job performance that she did not like?
A. She was very emphatic that there were serious



situations.
Q. And can you give me any example of what those situations, those serious situations were?
A. No.
Q. You don't know personally what those specific situations were?
A. No.
Q. And when you asked you were given an answer that she couldn't tell you because of confidentiality?
A. She said she didn't feel comfortable.
Q. Okay. You mentioned your own reason as to why you felt that the request for the extension should be denied. Were there any other reasons besides that? For example, were there any fiscal or economic reasons?
A. At that time? I don't know. I don't think so.
Q. Okay. Let me follow up on that a bit because of your response, at that time, you don't think so. Was there ever a time when fiscal policy reasons entered into your deliberations as far as requests for extension by the police department?
A. Right, yes.
Q. When was that?
A. With the lieutenant who was possibly moving up to chief or captain and I just said it was a move to



get the higher salary and then leave the position.
Q. Okay, and when was that, that that happened?
A. I don't really know. I would say maybe five years prior.
Q. Five years prior to Ken Olsen's request?
A. Yes.
Q. All right, what about the policy of retaining experienced officers so they could add stability to the department --
A. Right.
Q. -- and management. Did that ever --
A. That's important in situations, and every day the situation changes or every year the situation changes and right now in the particular situation we have at the police department, with a very young force and a whole group of officers retiring all at the same time in the upper segment that would, you know, the many years in service, if I were sitting there today I would not recommend denying someone. I would extend that because there are so few officers with experience left that it would be a detriment to the Town if that happened.
Q. Was this an issue that you considered when dealing with Ken Olsen's request?
A. No, we had experienced officers in the police



department right at this particular time and that's why I said to you earlier it fluctuates and it changes and times change. So at this particular year, 2005, would not be feasible to deny someone an extension if he had experience. It would be to our advantage, it would be advantageous to keep him on because the force is very young and inexperienced, but at this time when we had Mr. DePerry and Mr. Olsen, no, there were plenty of experienced officers on board.
Q. All right. Prior to your deposition this morning Councillor Dimaio indicated that there was a mandatory retirement policy for police officers of this town. Are you aware of that?
A. Yes.
Q. And what is that mandatory policy?
A. Actually it's the Rhode Island General Law.
Q. And what is that?
A. That says officers should retire at 25 years of age unless -- I mean 25 years of service unless they come before the council for a one-year extension, and I believe that was put in probably before I was born.
Q. Do you know of any notice that was ever given to the police officers or the police department in general that stated that no extensions would be given past 25 years?

A. That has been the policy that I knew since I came into the town 29 years ago.
Q. And I guess my question was a little bit different because you testified that up until Ken Olsen and Steve DePerry came for their extension at the same time in 2000, 2001, there had been no officer that you know of while you were on the council that had been denied a request for extension.
A. Right.
Q. Had, and my question was then, was there ever a notice given to the police department or members of the police department that the council was no longer going to grant extensions that were requested?
A. How could that be? I don't know what people are thinking.
Q. Do you know whether the council as a whole made or whether the council as a whole forwarded a notice of that type --
A. Absolutely not because we are individuals and we think individually and our votes are individual, so how could we put a paper into the police department saying we are no longer granting extensions?
Q. Did the council ever take a vote on that matter?
A. No.



Q. Okay, so I take it then that you know of no notices or letters or any written documentation that was ever sent to the police department during your time on the council that said we will not grant extensions?
A. Absolutely not. There were no notes ever sent like that.
Q. Okay. Were you on the council when Chief Giullini was serving the Town?
A. Yes.
Q. Were you on the council when his services with the Town ended?
A. Yes.
Q. Do you recall whether Ken Olsen weighed in on that issue of whether or not Chief Giullini should be continued in service?
A. Yes, I am aware of it because I was in the midst of it.
Q. Okay, and do you recall what his position on the Chief Giullini situation was?
A. He liked the chief and he backed the chief.
Q. Did he come before the council and state that?
A. No.
Q. How was it that you know that that was his position?



A. It was in the newspaper.
Q. Was his support for Chief Giullini discussed in any way at all when Ken was trying to get his extension?
A. No.
Q. Is that something that entered into your mind when you were deliberating over whether Ken should get his extension that he requested?
A. No, and let me if I may --
MR. RINALDI: There is no question before you.
THE WITNESS: Oh. Can I extend on that question?
MR. TREBISACCI: Sure you can. Thank you.
A. I find that repulsive if someone is thinking that because we had Chief Baker at the same time when Giullini was here whose wife -- and he wasn't chief, he was lieutenant -- whose wife wrote blistering letters in the newspaper about the council literally tearing us to shreds and then stomping on us and that didn't stop him from acquiring his extensions or moving up the ladder, and the council never interfered with the manager's decision as to whether Mr. Baker should move up and become captain or chief, so to imply that because Mr. Olsen had an opinion about a



chief, I find very repulsive that anyone on that council would hold that against him. That's the American way. We all have different opinions and that's what makes democracy.
MR. TREBISACCI: I appreciate your answer.
THE WITNESS: Thank you.
Q. Were you on the council when Steve Baker was elevated to chief?
A. I was on the council when he was elevated to captain.
Q. Okay, and was that after the Giullini situation?
A. Yes, right.
Q. You weren't on the council when he was elevated to chief, however.
A. No, but I came into this chamber during a coffee to congratulate him.
Q. Oh, I am sure you did. That's very noble of you. I think that's a great thing. Why is it that you would place more value in the report of the town manager who didn't work with Ken Olsen on a day-to-day type of basis versus the report that you received from the police chief who did work with Ken Olsen on a day-to-day basis?
A. Because evidently there was reports or

reprimands from a prior police chief that should have been discussed by the present police chief which was Steve Smith, and since he chose not to discuss that I felt that was a mark against that chief.

MR. TREBISACCI: Okay, hold on for a second. I just need to look through the records for a second. (Counsel perusing documents)

**Q.** Was there any relation at all between -- and again, please, don't -- I am not doing this to be offensive and I hope that you won't take offense by this but the purpose of my asking these questions, like the purpose of my asking the Giullini question is to find out what the answer is, not necessarily to make any implications. So the next one, the next question I have I am sure where you might feel, you might take offense from this. I am not asking it for that reason.

**A.** You are warning me not to bite your head off.

**Q.** Was there any relationship between the advancement of Lauren Matarese in the police department and the denial of Ken Olsen's request for an extension?

THE WITNESS: That's wild. Say that again?

**Q.** Was there any connection or any relationship



between the advancement of Lauren Matarese in the police department and Ken Olsen's request, denial of request for an extension?

**A.** What was she? I don't even know.

**Q.** I guess the reason for my question is --

**A.** What was her position? I don't even remember.

**Q.** Well, at the time didn't Lauren Matarese, wasn't Lauren Matarese promoted to the position that Ken Olsen was separated from?

**A.** I don't know.

**Q.** Okay, all right. If I --

THE WITNESS: She was not lieutenant then?

MR. TREBISACCI: No.

THE WITNESS: What was she, sergeant?

MR. TREBISACCI: I am just asking you what your recollection was.

**A.** I don't know, I have no idea.

**Q.** Did it have any bearing on the council or was it discussed at all in the council's deliberations over what -- when talking about Ken Olsen's request for an extension?

**A.** No.

**Q.** Okay. You already, we already discussed that Ken Olsen's request came at the time that Steve DePerry was making a request.



**A.** Right.

**Q.** What was the relation between the fact that Steve DePerry was making a request and Ken Olsen making a request with regard to the council's deliberations?

THE WITNESS: The relationship?

MR. TREBISACCI: Yes.

THE WITNESS: Among each man?

**Q.** Did one affect the other? For example, we didn't want to give Steve DePerry an extension, therefore we are not going to give Ken Olsen an extension.

**A.** No.

**Q.** That never came up?

**A.** No.

MR. TREBISACCI: That never entered into your thought processes either, all right.

(Witness shook her head)

MR. TREBISACCI: I have no other questions. Thank you.

MR. RINALDI: I have no questions.

(DEPOSITION CONCLUDED AT 11:40 A.M.)



DOCKET NO. 03-245 ML : U.S. DISTRICT COURT.
KENNETH A. OLSEN : DISTRICT OF RI
VS. :
TOWN OF WESTERLY, ET AL. : OCTOBER 20, 2005

<u>DEPOSITION OF PATRICIA A. DOUGLAS</u>

I have read the foregoing, and it is a true and accurate transcript of my testimony taken on October 20, 2005 at the Westerly Town Hall, 45 Broad Street, Westerly, RI 02891.

______________________________
PATRICIA A. DOUGLAS

Subscribed and sworn to before me this ________ day of __________________, 2005.

______________________________
Notary Public
My Commission Expires:

(JG)

**EXHIBIT 8**

**AFFIDAVIT OF LAURA DWYER**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

**KENNETH A. OLSEN**

**v.** **C.A.No.: 03-245-ML**

**TOWN OF WESTERLY; et al**

**AFFIDAVIT OF LAURA DWYER**

I, Laura Dwyer, on oath depose and state that:

1. I am the Human Resource Coordinator for the Town of Westerly.

2. I have reviewed the Town's records relating to requests by police officers for permission to continue to work beyond their mandatory retirement dates.

3. According to the records between 1990 and the fall of 2005, the requests of the following officers for permission to work for an additional year beyond retirement were approved:

   a. Detective Sergeant Stephen DePerry (1999, 1998, and 1997)
   b. Lieutenant Wayne Brusseau (1998)
   c. Sergeant Ronald Nye (1997)
   d. Captain Peter Plenninger (1994)
   e. Detective Sergeant Larry Gwaltney (1994)
   f. Chief Eugene Trombino (1996, 1995, 1994, 1993, and 1992)

4. According to the records, requests by Detective Sergeant Stephen DePerry and Lieutenant Kenneth Olsen to continue to work for additional year were denied in 2000.

Laura Dwyer
Laura Dwyer
Human Resource Coordinator
Town of Westerly

State of Rhode Island
County of Washington

Subscribed and sworn to before me on the 23rd day of November, 2005.

Mary Jane Knight
Notary Public
My Commission Expires: 5/17/06

**EXHIBIT 9**

**EXCERPTS FROM DEPOSITION OF MARY JANE DiMAIO**

A. No, and I personally did not.
MR. TREBISACCI: I appreciate that.
THE WITNESS: Okay.
Q. Since this time when Ken was denied his request for an extension have any other requests for extensions come before the council?
A. Yes. For the minutes of Steve DePerry, and I don't remember if it was his second or third time. It could very well have been his third time.
Q. Fine, but after January of 2001 were there any other requests up until the present?
A. I don't remember any.
Q. Okay. Has there ever been any notice given to the members of the police department in general that requests for extension would no longer be granted?
A. I can't remember any.
Q. Okay. Were you on the council when the services of Chief Giullini were terminated?
A. Yes.
Q. All right. Do you have any recollection where Ken Olsen weighed in on that, for lack of a better word, incident I guess with Chief Giullini?
MR. RINALDI: Let me put an objection to relevance on the record but you can answer.
A. Okay. I think as far as I know Chief Giullini



worked with Ken Olsen. I don't know if they were friends or not because I wasn't -- I am not in that situation but I know as far as myself I didn't like what was going on and I spoke out against it.
Q. Okay. Do you know whether, where Ken Olsen weighed in on that issue?
A. I don't know where he weighed in, no.
Q. Was his position on the Chief Giullini matter discussed in any way at all when he was trying to get his extension?
A. No.
Q. Was the advancement of Lauren Matarese discussed at all in relation to Ken Olsen's request for an extension?
A. No.
Q. Certainly that is something that you didn't discuss. Did anyone else bring that up?
A. The general discussion, and it not necessarily was in the council discussion but was that some of the councillors would like to move the police up a little faster than what was happening and I think that was sort of the air at the time.
Q. All right, and how did that relate to Lauren Matarese?
A. Well, then, that would have meant that she had



the possibility of becoming chief.
Q. Okay, if --
A. But not necessarily because the chief was not advanced by seniority, you know, and I do not want a chief advancement by seniority. Personally that's the way I stand. I want it to go out in the open public and the best person get it, and that's how Chief Giullini got it, and so the police in the whole would prefer seniority but I did not prefer that. That's just basically my, the way I stood on the whole subject.
Q. On the issue --
A. So I didn't take part in a lot of that conversation.
Q. And how did that relate I guess to Ken Olsen's request for an extension?
A. It really didn't.
Q. All right. Well, the confusion I have then I guess is if Ken Olsen was -- if Chief Smith gave a recommendation for Ken Olsen to --
A. Just for another year.
Q. -- to be extended, okay, doesn't that fly in the face of that logic of extending qualified individuals and advancing qualified individuals?
A. Again, I don't know how they thought so I don't



want to get in their minds. As far as I was concerned it was fine to extend him and that's what I did.
Q. Was there any relationship between the denial of Steve DePerry's request for an extension and the denial of Ken Olsen's request for an extension?
A. Not to my knowledge.
MR. TREBISACCI: I don't have any other questions. Thank you.
MR. RINALDI: I just have one if I could.

EXAMINATION BY MR. RINALDI

Q. The Town has a mandatory retirement policy for police officers.
A. Right.
Q. What's your opinion of that policy?
A. My opinion is there shouldn't be one. However, as I said, I want to -- as long as the person is physically able and mentally able I think they should be extended. However, when it comes to a point when they cannot do their job then certainly it would be on a case by case basis.
MR. RINALDI: Thank you, that's all I have.
MR. TREBISACCI: I just have a couple of