**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

**KENNETH A. OLSEN**

**v.** **C.A.No.: 03-245-ML**

**TOWN OF WESTERLY; et al**

**DEFENDANTS' REPLY TO THE PLAINITFF'S OBJECTION TO THEIR MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

On September 11, 2000, the Westerly Town Council rejected the plaintiff's request that he be allowed to continue working as a lieutenant in the Westerly Police Department and the Town's prosecuting attorney beyond his mandatory retirement date. This action was taken after Pamela Nolan, the then Town Manager, recommended that the request be denied. This was the first time a town manager had recommended that such a request be denied. This decision allowed the promotion of experienced junior officers who were ready to assume greater responsibility. The plaintiff then filed suit alleging this exercise of discretion violated his equal protection and due process rights. On November 28, 2005, the defendant's filed a motion for summary judgment seeking the entry of judgment in their favor on both allegations. The plaintiff filed an objection on December 15, 2005 and the defendants now file this reply memorandum.

## II. REPLY ARGUMENT

### A. Equal Protection Claim

The plaintiff's Equal Protection Claim is brought under the "class of one" doctrine. To defeat the defendant's motion for summary judgment, the plaintiff had to, *inter alia*, "identify specific evidence concerning similarly situated individuals ..." with

whom the plaintiff groups himself. Wojcik v. Massachusetts State Lottery Commission,300 F.3d 92, 104 (1[st] Cir. 2002); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, (1986) (Party opposing summary judgment has the burden to go beyond the pleadings to establish a genuine issue of material fact.). While the plaintiff makes the bald assertion that he was "in no way different than any of the other officers who were granted extensions[,]" Plaintiff's Memorandum of Law at 3, he offered no evidence that he was similarly situated to those officers who were granted extensions in the past.[1] There is no evidence that the plaintiff held the same rank and position as those officers, something which the plaintiff seems to acknowledge is critical. See Plaintiff's Memorandum of Law at n 2. The plaintiff has offered no evidence that his was not the first request that a town manager recommended against granting. He has offered no evidence that the officers who were granted extensions were disciplined for interfering with a police investigation involving potential assault charges against family members. He has offered no evidence as to the state of the department and the experience level of junior officers at the time those requests were granted. To establish the required level of similarity, he must do all of these things. Barrington Cove Limited Partnership v. Rhode Island Housing and Mortgage Finance Corporation, 246 F.3d 1, 8 (1[st] Cir. 2001)("[I]t [is] essential that [a class-of-one plaintiff] alleged ...that it and its coapplicants were similarly situated in all relevant respects"). Moreover, the plaintiff has not even suggested that the decision to deny his request constituted a "gross abuse of power," as required by the First Circuit. Tapalian v. Tusino, 377 F.3d 1, 6 (1[st] Cir. 2004)

[1] Contrary to the plaintiff's assertion, the defendants did introduce sworn testimony that Chief Gulluscio's first request for an extension was denied in or about 1981. See Deposition of Richard Comolli at 14-15 (Appended to Defendant's Memorandum of Law In Support of Motion For Summary Judgment as Exhibit 5.)

Instead, the plaintiff relies primarily on the fact the fact that Ms. Nolan did not expressly state to the Town Council that the written reprimand issued to the plaintiff in 1998 was the reason she recommended that the request be denied. Ms. Nolan did, however, inform the Council that there were "serious things in [his personnel] file." Deposition of Patricia Douglas at 19 (Appended to Defendants' Memorandum of Law as Exhibit 7) More importantly, this failure does not change the fact that there were other valid reasons to deny the request, including the promotion of experienced junior officers.[2] Thus, this issue is irrelevant because the plaintiff must establish "that totally illegitimate animus was the **sole cause** of [the Council's decision to deny his request for permission to work beyond his mandatory retirement date.]" Lauth v. McCollum, 424 F.3d 634 (7th Cir. 2005)(Emphasis added); see also, Barrington Cove, 246 F.3d at 11.

B. Due Process Claim

A constitutionally protected property interest in continued public sector employment only exists if it is based upon "a statute, rule or contract [that] grants a right to continued employment, absent a showing of cause." Salisbury v. Stone, 518 A.2d 1355, 1360 (R.I. 1986) *citing* Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701 (1972) (Internal quotations omitted). The plaintiff points to no such statute, rule or contract. Instead, the plaintiff points to Wilkinson v. State Crime Laboratory Commission, 788 A. 2d 1129 (R.I. 2002) and the Rhode Island Law Enforcement Officers Bill of Rights ("LEOBOR"). This reliance is misplaced.

---

[2] (Exhibit 7 -- Douglas at 8) ("I thought there should be a blood transfusion, that I thought the top was stale and we needed new blood up there."); (Exhibit 6 -- Avedesian at 11-12) ("I voted to deny his request … because I felt [*inter alia*] that the department at that time needed new blood, a chance for people to move up[.]") ; see also, (Exhibit 5 -- Comolli at 15) (Observing that "a lot of policemen coming up through the ranks don't like these extensions because it stops them from advancing.") (Exhibit numbers refer to Defendants Memorandum of Law in Support of their motion for summary judgment.)

Unlike the instant plaintiff, the plaintiff in Wilkinson had an expectation of continued state employment that was grounded in a state statute. In accordance with the provisions of § 36-4-59(a)(1) of the Rhode Island General Laws, Wilkinson had "achieved full status under the merit system in his classified position [approximately four years prior to his termination for insubordination.]" Wilkinson, 788 A.2d at 1137. As such, Wilkinson could "not be fired except for cause … [and] … may not be separated from state service because of layoffs or reorganizations." Id. at 1139. "[A]chieving full status under the merit system provides state-government employees with a property right in the position and classification that they hold at the time they achieve full status, entitling such employees to due-process and just-compensation protections against any attempted elimination or alternation of their property rights." Id. at 1140. Prior to the completion of twenty years of service, that right was "a mere gratuity or floating expectancy[.]" Id. at 1139. Unlike § 36-4-59(a)(1) which creates and expectation of continued employment of twenty years, the Mandatory Retirement Statute destroys any expectation of continued employment at the end of officer's twenty-five year of service. Power v. City of Providence, 582 A.2d 895, 905 (R.I. 1990) ("Under state law, Power's property interest ended by its very terms when Power reached the [mandatory retirement] age of sixty."). Thus, the plaintiff's ability to work beyond his mandatory retirement date was wholly dependent upon the discretion of the Town Council and as such cannot form the basis of a constitutionally protected property interest. Town of Castle Rock, Colorado v. Gonzales, 125 S.Ct. 2796, 2803 (U.S. 2005).

LEOBOR was enacted in 1976 "to protect police officers from any impairments of their rights when their conduct is questioned." Coalition of Black

Leadership v. Cianci, 570 F.2d 12, 14 (1st Cir. 1978). It is "the exclusive remedy for permanently appointed law enforcement officers who **are** under investigation by a law-enforcement agency for any reason that **could lead to** disciplinary action, demotion or dismissal." City of East Providence v. McLaughlin, 593 A.2d 1345, 1348 (R.I. 1991) (Emphasis added, citation omitted). LEOBOR strictly dictates the manner in which a police department conducts an investigation into non-criminal misconduct by a police officer. R.I.Gen.Laws § 42-28.6-2. If, after the investigation is complete, a police department wishes to take "a punitive measure" against the officer, LEOBOR also establishes a detailed procedure by which the officer may challenge the propriety of the decision. R.I.Gen.Laws §§ 42-28.6-4 through 12.[3] There is nothing in LEOBOR which provides the plaintiff with an expectation of continued employment as a Westerly police officer beyond his mandatory retirement date. LEOBOR merely establishes a process which governs disciplinary action against police officers. The Town Council did not discipline the plaintiff in September of 2000. It denied his request that he be allowed to continue working beyond his mandatory retirement date of December 31, 2000. LEOBOR is simply not applicable to this situation.

Respectfully submitted,
Defendants,
By their Attorneys

George H. Rinaldi (#5599)
Little Medeiros Kinder Bulman & Whitney, PC
72 Pine Street
Providence, RI 02903
Tel: (401) 272-8080
Fax: (401) 272-8195

Dated: December 29, 2005

[3] The plaintiff did not contest the 1999 written reprimand pursuant to LEOBOR and agreed that his actions raised an "appearance of impropriety[."]. (Exhibit 1 -- Deposition of plaintiff at 25-26)

## CERTIFICATION

I hereby certify that on the 29th day of December, 2005 I have caused a true and accurate copy of the within Reply Memorandum to be sent by First Class mail, postage prepaid, to Raymond T. Trebisacci, Esq., Trebisacci, Reck & Hall, LLC, 398 Liberty Street, Pawcatuck, CT 06379

O:\Data\612.104\Dktct\Brf\05929.doc

# Exhibit 1

# Excerpt From Deposition of Plaintiff

A I don't know what a written warning would be. We don't have those in the Westerly Police Department. It's simply a written reprimand.
**Q And this is a form of discipline?**
A Yes.
**Q And the document I've had marked as Defendant's 2, this would be a disciplinary event at the level of a written reprimand?**
A Correct.
**Q Regarding your conduct concerning the events surrounding your sister-in-law in August of '98?**
A That's correct.
**Q Did you contest this through the police officer's bill of rights?**
A No. I just responded with a letter explaining myself to the Chief; left it at that.
**Q As a lieutenant, are you a member of the Police Officer's Union?**
A No. We're a member of the FOP, but not the bargaining unit. It's kind of a strange entity.
**Q Did you have grievance rights? When you were a lieutenant, did you have the right to file grievances?**
A I'm sure I did. I never had the occasion to,



but I'm sure I did.
**Q Did you file a grievance over the warning -- the reprimand, excuse me?**
A No. I accepted the Chief's determination. And even though I explained myself, I realized that in his eyes it did have the appearance of impropriety, and I agreed with him.
**Q And just looking at the second page of this, this stayed in your file for five years?**
A And when I retired it disappeared.
**Q Disappeared, what do you mean by that?**
A The contract states that if you receive any letter of reprimand, it will stay in your jacket for five years or until you retire, at which point it's removed.
**Q Contract, were you referring to the collective bargaining agreement with the union?**
A Yes.
**Q Could you give me an idea of -- I've now got to get an understanding of how a lieutenant is in this bargaining unit, but not covered by certain events. Could you tell me what your understanding is.**
A It's called the "Me, too" clause. We get



whatever the bargaining unit has, and in some cases more.
**Q Do you pay union dues?**
A It's a reduced rate, because we're not paying for actual litigation fees, should there be any. I think that's about the only difference, when you become lieutenant your dues structure is changed, because you don't have the representation from the union attorney that you would have had as a sergeant or below. You're pretty much on your own as far as legal services, therefore the rate is reduced.
**Q Do you have the right to vote for officers?**
A No. No right to vote either.
**Q Roughly, do you know how much of a reduction you get? Is it 20 percent, 10 percent?**
A I believe at the time it went from $24 a pay period down to ten.
**Q Pay period's every two weeks?**
A Yes.
**Q Now, as I understand the retirement ordinance, there's a mandatory retirement after 25 years of service, but it's the year in which you hit that anniversary date. So, if you're -- I think in**



**your instance your anniversary date was August.**
A Yes.
**Q So, in August of 2000 it was triggered, but under the ordinance you could stay until the end of the year; is that correct?**
A Yes. Unless I got an extension from the Town Council to stay an additional year.
**Q And the extension process, you would request an extension, and then it's in the discretion of the Town Council whether to grant it or not; is that correct?**
A Correct.
**Q When you were hired, were you aware of that retirement provision?**
A No. The retirement provision was different when I first came on. It wasn't corrected to its present state probably until 1980, '81.
**Q What was the change?**
A There were two or three different retirement systems on board at the time when I came on in 1975. Some people were under one, another group was under another, and still the third group was under a third. They finally unified, made the retirement as it is now, probably around 1980 or